NOT YET SCHEDULED FOR ORAL ARGUMENT
No. 25-5380

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CHIESI USA, INC.,

*Appellant*,

v.

ROBERT F. KENNEDY, JR., Secretary, United States Department of Health and Human Services,

and

MEHMET OZ, Administrator of the Centers for Medicare & Medicaid Services,

*Appellees*.

On Appeal from the United States District Court for the District of Columbia

# BRIEF OF APPELLANT

**ROPES & GRAY LLP**
Douglas Hallward-Driemeier
Stephanie A. Webster
Chetan A. Patil
Adam R. Safadi
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4776
douglas.hallward-driemeier@ropesgray.com

*Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

The parties before the district court and in this Court are Appellant Chiesi USA, Inc. ("Chiesi"), and Appellees Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services, and Mehmet Oz, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services. There are no intervenors or amici curiae in this action.

### B. Rulings Under Review

Chiesi seeks review of the August 27, 2025, Order and Memorandum Opinion (Dkt. No. 37), issued by the district court in *Chiesi USA, Inc. v. Kennedy*, No. 1:24-cv-260-ACR (D.D.C. Aug. 27, 2025), denying Chiesi's motion for summary judgment and granting the government's motion for summary judgment. JA__; *Chiesi USA, Inc. v. Kennedy*, No. 1:24-cv-260-ACR, 2025 WL 2466045 (D.D.C. Aug. 27, 2025), JA__, JA__.

### C. Related Cases

The case on review has not previously been before this Court or any other court. There are no related cases as defined in Circuit Rule 28(a)(1)(C).

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Counsel for Chiesi certifies that no publicly held corporation has a 10% or greater ownership interest in Chiesi, and that the parent company of Appellant is Chiesi Farmaceutici S.p.A.

## TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1
STATEMENT OF JURISDICTION .......... 4
STATEMENT OF ISSUES .......... 5
STATEMENT OF STATUTES AND REGULATIONS .......... 5
STATEMENT OF THE CASE .......... 5
I. STATUTORY AND REGULATORY BACKGROUND .......... 5
A. Medicaid Drug Rebate Program .......... 5
B. Alternative Rebates for "Line Extension" Drugs .......... 8
C. FDA's Expertise on Drug Classifications .......... 11
D. CMS's Initial Rulemaking Excluded Drugs of a New Strength From the Definition of "Line Extension" .......... 13
E. The 2020 Rule Changed CMS's Long-Held View On Strength Changes .......... 15
II. FACTUAL BACKGROUND .......... 18
A. Chiesi .......... 18
B. Ferriprox .......... 19
III. PROCEDURAL BACKGROUND .......... 21
SUMMARY OF THE ARGUMENT .......... 21
STANDARD OF REVIEW .......... 24
ARGUMENT .......... 25
I. THE 2010 "LINE EXTENSION" AMENDMENT DOES NOT INCLUDE CHANGES IN STRENGTH .......... 25
A. Congress defined "line extensions" in terms of a "new formulation" of a drug, a technical term of art with an established meaning, which CMS recognized for a decade after the 2010 amendment .......... 25
1. The technical meaning of "new formulation," which FDA had already established before 2010, does not include changes in the amount of active ingredients .......... 26

2. The broader statutory context confirms that a drug strength change is not a new formulation ..... 30

B. Even if the 2010 Amendment Was Not Clear on Its Own Terms, New Strengths Would Be Excluded Under the Presumption Against Retroactivity ..... 32

1. Tying liability to a price set prior to the 2010 amendment imposes a retroactive effect ..... 34

2. Congress did not express a clear intent to make the 2010 amendment apply retroactively to new strengths ..... 36

C. CMS's and the District Court's Reading of "New Formulation" Finds No Basis in the Statutory Text ..... 38

1. CMS and the district court began from the flawed premise that CMS has discretion to interpret "new formulation" expansively ..... 39

2. The district court erred in piecing together dictionary definitions of the terms "new," "formulation," and "formula" ..... 41

3. CMS's definition encompasses even changes that all agree are beyond the scope of the statute ..... 42

II. THE 2020 RULE AND MANUFACTURER RELEASE NO. 119 ARE IMPERMISSIBLY RETROACTIVE AND DENY FAIR NOTICE ..... 45

A. CMS lacks express congressional authorization under the Medicaid statute to engage in retroactive rulemaking ..... 46

B. The 2020 Rule retroactively imposes consequences on Chiesi for decisions made about the pricing of Ferriprox before the Rule's issuance ..... 46

1. The 2020 Rule increases Chiesi's liability based solely on conduct that occurred before CMS changed the regulation and to which a competitor without that pre-2020 history would not be subject ..... 47

2. The 2020 Rule's about-face from CMS's longstanding interpretation of new formulation retroactively changes the legal landscape ..... 52

3. The 2020 Rule's about-face similarly denied Chiesi fair notice ..... 55

CONCLUSION......................................................................................56

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Tobacco Co. v. Patterson*,
456 U.S. 63 (1982)....................................................................................43

*Arkema Inc. v. EPA*,
618 F.3d 1 (D.C. Cir. 2010)..........................................................52, 53, 54, 55

*Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. EPA*,
72 F.4th 284 (D.C. Cir. 2023).......................................................................25

*BFP v. Resolution Tr. Corp.*,
511 U.S. 531 (1994)....................................................................................30

*Bondi v. VanDerStok*,
604 U.S. 458 (2025)....................................................................................27

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020)...............................................................................25, 41

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)..........................................................................25, 45, 46

*Chamber of Com. of U.S. v. Fed. Election Comm'n*,
69 F.3d 600 (D.C. Cir. 1995)........................................................................33

*Chiesi USA, Inc. v. Kennedy*,
No. 1:24-cv-260-ACR, 2025 WL 2466045 (D.D.C. Aug. 27, 2025)...................4

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)...............................................................................55, 56

*Doe v. Sec. & Exch. Comm'n*,
28 F.4th 1306 (D.C. Cir. 2022).....................................................................39

*EB5 Holdings Inc. v. Edlow*,
166 F.4th 1106 (D.C. Cir. 2026)...................................................................33

*FAA v. Cooper*,
566 U.S. 284 (2012)....................................................................................26

*Fabi Constr. Co. v. Sec'y of Lab.*,
508 F.3d 1077 (D.C. Cir. 2007)....................55, 56

*FCC v. AT & T Inc.*,
562 U.S. 397 (2011)....................42

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................30

*INS v. St. Cyr*,
533 U.S. 289 (2001)....................36

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994).................... 25, 32, 33, 34, 35, 48, 50, 51

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................24, 25, 27, 29, 39

*Luna Perez v. Sturgis Pub. Schs.*,
598 U.S. 142 (2023)....................44

*Nat'l Mining Ass'n v. Dep't of Lab.*,
292 F.3d 849 (D.C. Cir. 2002)....................46, 52

*Northeast Hosp. Corp. v. Sebelius*,
657 F.3d 1 (D.C. Cir. 2011)....................26, 45, 48

*Northstar Wireless, LLC v. FCC*,
38 F.4th 190 (D.C. Cir. 2022)....................55

*Quantum Ent. Ltd. v. U.S. Dep't of Interior*,
714 F.3d 1338 (D.C. Cir. 2013)....................32, 34, 45, 47, 48

*Rodriguez v. United States*,
480 U.S. 522 (1987)....................44

*Safari Club Int'l v. Zinke*,
878 F.3d 316 (D.C. Cir. 2017)....................24

*Taggart v. Lorenzen*,
587 U.S. 554 (2019)....................26

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) .....31

*United States v. Hansen*,
599 U.S. 762 (2023) .....26

*United States v. Williams*,
553 U.S. 285 (2008) .....40

*Van Buren v. United States*,
593 U.S. 374 (2021) .....26

*Vanda Pharm., Inc. v. CMS*,
98 F.4th 483 (4th Cir. 2024) .....42

*Vartelas v. Holder*,
566 U.S. 257 (2012) .....32, 36

*Wilder v. Va. Hosp. Ass'n*,
496 U.S. 498 (1990) .....5

*Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*,
563 F. Supp. 3d 428 (D. Md. 2021) .....50

*Yates v. United States*,
574 U.S. 528 (2015) .....40

**Statutes**

5 U.S.C. § 706 .....24

21 U.S.C. § 355 .....11

28 U.S.C. § 1291 .....4

28 U.S.C. § 1331 .....4

42 U.S.C. § 1396 .....5, 46

42 U.S.C. § 1396a .....5

42 U.S.C. § 1396b .....5

42 U.S.C. § 1396r-8(b) .......... 7, 31

42 U.S.C. § 1396r-8(c) .......... 5, 7, 8, 9, 10, 25, 27, 31, 35, 37

Comprehensive Addiction and Recovery Act of 2016,
Pub. L. No. 114-198, § 705, 130 Stat. 695 (2016) .......... 10

Health Care and Education Reconciliation Act,
Pub. L. No. 111-152, § 1206, 124 Stat. 1029 (Mar. 30, 2010) .......... 8, 9

Omnibus Budget Reconciliation Act of 1990,
Pub. L. No. 101-508, § 4401, 104 Stat. 1388 (1990) .......... 8, 35

Omnibus Budget Reconciliation Act of 1993,
Pub. L. No. 103–66, § 13602, 107 Stat. 312 (1993) .......... 8

Patient Protection and Affordable Care Act,
Pub. L. No. 111-148, § 2501, 124 Stat. 119 (Mar. 23, 2010) .......... 8, 9

**Other Authorities**

21 C.F.R. pt. 314 .......... 11

21 C.F.R. § 314.3 .......... 40

42 C.F.R. § 413.234 .......... 29

42 C.F.R. § 447.502 .......... 12, 17

42 C.F.R. § 447.514 .......... 12

72 Fed. Reg. 39142 (July 17, 2007) .......... 7

77 Fed. Reg. 5318 (Feb. 2, 2012) .......... 13, 28, 29, 37, 54

81 Fed. Reg. 5170 (Feb. 1, 2016) .......... 7, 14, 29, 37, 54

83 Fed. Reg. 12770 (Mar. 23, 2018) .......... 6

84 Fed. Reg. 12130 (Apr. 1, 2019) .......... 7, 14, 15, 29, 37, 53, 54

85 Fed. Reg. 37286 (June 19, 2020) .......... 5, 15

85 Fed. Reg. 87000 (Dec. 31, 2020) .......... 2, 17, 39, 53

136 Cong. Rec. S15777-02 (daily ed. Oct. 18, 1990) (statement of Sen. Orrin Hatch) .......... 6

B. Jayanthi et al., *Per Oral Extended Release Products - An Overview*, 1 J. Applied Pharm. Sci. 50, 51 (2011) .......... 9

CDER, FDA, Manual of Policies & Procedures 5018.2, *NDA Classification Codes* 1–2 (rev. Jan. 28, 2022), https://www.fda.gov/media/94381/download .......... 12

Chiesi, *About Us*, https://www.chiesiusa.com/our-company/ (last visited Aug. 1, 2026) .......... 18

Chiesi, *Sustainability*, https://www.chiesi.com/en/sustainability (last visited Aug. 3, 2026) .......... 18

CMS, Manufacturer Release No. 119 (Nov. 7, 2023), https://www.medicaid.gov/prescription-drugs/downloads/mfr-rel-119.pdf .......... 18, 20, 21, 45, 56

FDA, Drugs@FDA Glossary of Terms, https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms .......... 40

FDA, *NDA Classification Codes*, MAPP § 5210.8, at 3 (July 30, 2006), web.archive.org/web/20120302021525/http:/www.fda.gov/downloads/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ManualofPoliciesProcedures/ucm079776.pdf .......... 28

FDA, *NDA Classification Codes*, MAPP § 5018.2 (Nov. 4, 2015), https://web.archive.org/web/20191213212542/https://www.fda.gov/media/94381/download .......... 28

FDA, *NDA Classification Codes*, MAPP § 5018.2 (Dec. 8, 2022), https://www.fda.gov/media/94381/download .......... 12, 28

FDA, *What We Do*, https://www.fda.gov/about-fda/what-we-do .......... 11

Gregory B. Lim, *Warfarin: from rat poison to clinical use,* Nature Reviews Cardiology (Dec. 14, 2017), https://www.nature.com/articles/nrcardio.2017.172 .......... 41

H.R. Rep. No. 111-299, pt. 1 (2009) ....................................................................9, 44

Inderbir S. Padda et al., *Tofacitinib*, StatPearls (July 3, 2023), https://www.ncbi.nlm.nih.gov/books/NBK572148/..........................................41

Ramsey Baghdadi, *Medicaid Best Price*, Health Affairs (Aug. 10, 2017), https://www.healthaffairs.org/do/10.1377/hpb20171008.000173/ ......................6

S. V. Kaveri et al., *Intravenous immunoglobulins in immunodeficiencies: more than mere replacement therapy,* 164 Clinical & Experimental Immunology 2 (June 2011), *https://pmc.ncbi.nlm.nih.gov/articles/PMC3087903//*.......................................40

## GLOSSARY OF ABBREVIATIONS

AMP ........ Average Manufacturer Price

APA ........ Administrative Procedure Act

CDER ... Food and Drug Administration, Center for Drug Evaluation and Research

CMS ........ Centers for Medicare & Medicaid Services

EPA ........ Environmental Protection Agency

FDA ........ Food and Drug Administration

HHS ........ Department of Health and Human Services

JA ........ Joint Appendix

MAPP .... Food and Drug Administration, Center for Drug Evaluation and Research Manual of Policies & Procedures

MDRP ........ Medicaid Drug Rebate Program

NDA ........ New Drug Application

NDRA ........ National Drug Rebate Agreement

## INTRODUCTION

For a decade, the Centers for Medicare & Medicaid Services ("CMS") told drug manufacturers, like Plaintiff-Appellant, Chiesi USA, Inc. ("Chiesi"), that they were not subject to heightened drug rebate liability for marketing different drug strengths of preexisting products. CMS's position mirrored the established meaning of a technical term Congress used in the 2010 legislation. Moreover, by historically construing the statute to avoid imposing higher rebate liability on new drug strengths based on prior pricing decisions, CMS avoided a problematic retroactive application that Congress had never embraced. But, after lulling manufacturers with its repeated representations about drug strengths, CMS abruptly reversed course in 2020, exposing Chiesi (and other manufacturers) to millions of dollars in increased Medicaid rebates based on pricing decisions made pursuant to CMS's previous guidance that could not be undone. The district court's judgment upholding that imposition of retroactive liability was based on a misreading of the 2010 statute and a fundamental misunderstanding of how the rule discriminated between manufacturers based solely on their pre-rule conduct.

In 1990, Congress imposed enhanced Medicaid rebates for increases in drug prices that exceeded inflation, but Congress was careful to avoid any retroactivity concerns for existing drugs by making the base price for calculating the rebate the drug's 1990 price (i.e., the price contemporaneous with the effective date of the new

law), instead of the price when the drug was initially marketed. In 2010, to close a perceived loophole, Congress amended the enhanced inflation-exceeding rebate to cover "line extension[s]" of the original drug. Congress defined a "line extension" as a "new formulation," borrowing a term of art used by the Food and Drug Administration ("FDA") to refer to changes to a drug's *inactive* ingredients, but not changes to the amount of its *active* ingredients. Thus, the increased rebate liability, as FDA and Congress understood it, did not apply to new products with different drug strengths than preexisting drugs.

For ten years, CMS agreed that new drug strengths were not line extensions and told manufacturers like Chiesi to follow that construction. But in 2020, CMS adopted a rule ("2020 Rule") defining new formulation to mean essentially *any* change to a drug, including strength changes. CMS admitted that this new definition would reach drugs that "would not now be currently classified as line extensions under the statutory definition of line extension" CMS historically applied. Medicaid Program; Establishing Minimum Standards in Medicaid State Drug Utilization Review (DUR) and Supporting Value-Based Purchasing (VBP) for Drugs Covered in Medicaid, Revising Medicaid Drug Rebate and Third Party Liability (TPL) Requirements, 85 Fed. Reg. 87000, 87096 (Dec. 31, 2020).

CMS's regulatory about-face has precisely the retroactive effect that Congress intentionally avoided in 1990; it makes Medicaid drug rebates for new products of

different strengths depend on pricing decisions made long before the new rule was announced. This regulatory change means that manufacturers like Chiesi face inflated liability solely for their past conduct. If two manufacturers introduced competing products today, with the same price, only the manufacturer with an earlier-introduced, different-strength product would be subject to the enhanced rebate. This would be the case even though the cost of the competing, later-to-market drug would be the same as the cost of the product with an earlier, different-strength version.

As a matter of statutory construction, CMS's 2020 definition of "new formulation" as encompassing changes to drug strength is contrary to the best reading of the term within the statutory context. Congress's decision to borrow a technical term from FDA means that term carries FDA's established understanding, which, as CMS acknowledged for a decade, did not cover changes to drug strengths. But even if some question remained on the proper reading of the statute, the presumption against retroactivity would compel that construction. Statutes are given retroactive effect only to the extent Congress unambiguously expresses an intent that it apply retroactively. Where, as here, the relevant agency originally read the statute as *not* reaching new drug strengths, and only reversed course a decade later, the statute cannot possibly reflect a clear Congressional intent to impose retroactive liability on new drug strengths. Reading "new formulation" according to its

established technical meaning borrowed from FDA avoids giving the statute a retroactive application to drug strengths that Congress never intended.

For similar reasons, the 2020 Rule itself is impermissibly retroactive and denies Chiesi fair notice. CMS has no congressional authorization to issue retroactive rules. However, its regulatory U-turn attaches new legal consequences to pricing and acquisition decisions made years earlier, even though CMS and FDA had agreed for years that strength changes were not line extensions and CMS had expressly required drug manufacturers to rely on the statute and CMS's interpretation of it.

Accordingly, this Court should reverse the district court's decision and set aside CMS's new definition of "new formulation" and its imposition of that change retroactively to drugs marketed prior to the 2020 Rule's effective date.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

This appeal arises from final judgment on August 27, 2025, granting Defendants' Motion for Summary Judgment and denying Plaintiff's Cross-Motion for Summary Judgment, which decided all claims in the lawsuit. JA__[Mem. Op.]; *Chiesi USA, Inc. v. Kennedy*, No. 1:24-cv-260-ACR, 2025 WL 2466045 (D.D.C.

Aug. 27, 2025). Plaintiff timely noticed this appeal on October 29, 2025. JA__[Notice of Appeal (Dkt. 29)].

## STATEMENT OF ISSUES

1. Whether the 2020 Rule's definition of "new formulation" conflicts with the best reading of the statutory language at 42 U.S.C. § 1396r-8(c)(2)(C), especially in light of the presumption against retroactivity?

2. Whether the 2020 Rule is impermissibly retroactive and denies fair notice by applying its new definition of a line extension to drugs that were already marketed and whose original prices were set prior to the proposed rule, *see* 85 Fed. Reg. 37286, 37294–95 (June 19, 2020)?

## STATEMENT OF STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum to this Brief.

## STATEMENT OF THE CASE

### I. STATUTORY AND REGULATORY BACKGROUND

#### A. Medicaid Drug Rebate Program

The Medicaid Act, enacted in 1965, established a cooperative federal-state program aimed at providing medical assistance to low-income individuals and families. 42 U.S.C. § 1396 *et seq.*; *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). As part of this program, the federal government provides matching funds for medical assistance expenditures, including "covered outpatient drugs," under an approved state Medicaid plan. 42 U.S.C. §§ 1396, 1396a, 1396b.

In 1990, Congress established the Medicaid Drug Rebate Program ("MDRP") to expand drug coverage in state Medicaid programs and to encourage continued research and development of drugs. *See, e.g.*, 136 Cong. Rec. S15777-02 (daily ed. Oct. 18, 1990) (statement of Sen. Orrin Hatch). The MDRP was specifically "implemented in such a way as to preserve the incentives for continued pharmaceutical research and development," which Congress identified as "the key to conquering disease and improving health." *Id.*

To participate in the MDRP for *any* of their covered outpatient drugs, drug manufacturers must enter into and abide by a National Drug Rebate Agreement ("NDRA") for "*all* their covered outpatient drugs." Medicaid Program; Announcement of Medicaid Drug Rebate Program National Rebate Agreement, 83 Fed. Reg. 12770, 12782 (Mar. 23, 2018) (emphasis added). Because forgoing Medicaid and Medicare Part B coverage for all of a manufacturer's covered outpatient drugs is commercially untenable, participation in the MDRP is "essentially mandatory." Ramsey Baghdadi, *Medicaid Best Price*, Health Affairs (Aug. 10, 2017), https://www.healthaffairs.org/do/10.1377/hpb20171008.000173/. The NDRA requires drug manufacturers to comply with the Medicaid statute, including any "changes thereto, implementing regulations, agency guidance, and this Agreement." 83 Fed. Reg. 12770 at 12785.

Manufacturers must report to Defendants the Average Manufacturer Price ("AMP") and the Best Price (both statutorily defined) at which each covered outpatient drug is offered each quarter. 42 U.S.C. § 1396r-8(b)(3). CMS instructs drug manufacturers to "rely on the statutory definition" and "to use reasonable assumptions in their determination of whether their drug qualifies as a line extension drug." 81 Fed. Reg. 5170, 5197, 5265 (Feb. 1, 2016); *see, e.g.*, 84 Fed. Reg. 12130, 12132 (Apr. 1, 2019) (same); 72 Fed. Reg. 39142, 39164, 39166, 39167, 39171, 39191, 39211 (July 17, 2007) (same).

For each quarterly rebate period, a drug manufacturer must pay a rebate for each unit of covered outpatient drug reimbursed by a state Medicaid program. 42 U.S.C. § 1396r-8(b). The amount is based on the reported pricing and other drug product information. *Id.* § 1396r-8(c).

The standard rebate formula is equal to the sum of two components. The first component—the "basic" amount—is calculated as the greater of (a) 23.1 percent of the AMP or (b) the difference between AMP and Best Price for the drug's dosage form (e.g., oral tablet versus oral solution) and strength (*e.g.*, 500 mg versus 100 mg). *Id.* § 1396r-8(c)(1). The second "additional" component increases the rebate by the "amount (if any) by which" the AMP of the drug has increased faster than the rate of inflation. *Id.* § 1396r-8(c)(2). The sum of these two components is multiplied by "the total number of units of such dosage form and strength" paid for by each

state Medicaid program during the rebate period. *Id.* § 1396r-8(c)(1)(A)(i), (c)(2)(A)(i).

When it enacted the inflation-based additional rebate component in November 1990, Congress recognized that imposing increased rebate liability on new drug sales based on past price increases would raise retroactivity concerns. Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4401, 104 Stat. 1388 (1990). Thus, for drugs marketed before the MDRP was enacted, Congress made the base date AMP the AMP "in effect on October 1, 1990," rather than when the drug was first marketed. *Id.*[1] In so doing, Congress evidenced a clear intent to avoid any retroactivity effect that would arise from pegging the inflation-based additional rebate liability to preexisting pricing decisions.

### B. Alternative Rebates for "Line Extension" Drugs

In 2010, Congress amended the MDRP as part of the Affordable Care Act to create an alternative rebate for "line extension[s]" of existing drug products. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 2501, 124 Stat. 119, 309 (Mar. 23, 2010) (codified at 42 U.S.C. § 1396r-8(c)(2)(C)); Health Care and

---

[1] Congress later amended the base rate calculation for drugs approved on or before the MDRP's adoption to be the AMP for the quarter immediately preceding its enactment, i.e., the AMP "for the calendar quarter beginning July 1, 1990" and ending September 30, 1990. Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103–66, § 13602(a), 107 Stat. 312 (1993); *see also* 42 U.S.C. § 1396r-8(c)(2)(A) (same).

Education Reconciliation Act, Pub. L. No. 111-152, § 1206(a), 124 Stat. 1029 (Mar. 30, 2010).[2] The line extension provision purported to address a specific concern: that manufacturers could avoid the additional, inflation-based rebate by introducing slightly altered, higher-priced versions of existing drugs. *See* H.R. Rep. No. 111-299, pt. 1, at 635 (2009).

In amending the statute, Congress chose to define "line extension" to mean "with respect to a drug, a new formulation of the drug, such as an extended release formulation." 42 U.S.C. § 1396r-8(c)(2)(C). "New formulation" is a term of art that already had an established meaning in the context of drug classifications, *see infra* 25-26. FDA had long defined a "new formulation" to be a change to the drug's inactive ingredients, which did not encompass changes to the amount of active ingredients. Congress did not provide its own definition of "new formulation" and provided only one example, i.e., "an extended release formulation," a change generally achieved by changing the drug's inactive ingredients. *Id.*; *see* B. Jayanthi et al., *Per Oral Extended Release Products - An Overview*, 1 J. Applied Pharm. Sci.

[2] The additional rebate as originally enacted applied to "a drug that is a new formulation." Affordable Care Act § 2501. A week later, Congress revised the language to specify that the provision applied to "a drug that is a line extension," and defined line extension as a "new formulation." Health Care and Education Reconciliation Act § 1206(a). The current language of the statute reflects this ministerial amendment.

50, 51 (2011) (explaining that the extended release mechanism is the coating, not the active ingredient).

In 2016, following the opioid crisis, Congress further amended the line extension definition to clarify that line extension "does not include an abuse-deterrent formulation of the drug (as determined by the Secretary), regardless of whether such abuse-deterrent formulation is an extended release formulation." Comprehensive Addiction and Recovery Act of 2016, Pub. L. No. 114-198, § 705(a), 130 Stat. 695, 753 (2016). Congress has not changed the definition of "line extension" since 2016.

For a "line extension" drug, the manufacturer must pay the greater of the standard rebate or the alternative rebate. The alternative rebate is calculated as the basic rebate "increased by the product of" (1) the AMP of the line extension drug, (2) "the highest additional rebate (calculated as a percentage of [AMP]) . . . for any strength of the original" drug, and (3) "the total number of units of each dosage form and strength of the line extension [drug]." 42 U.S.C. § 1396r-8(c)(2)(C)(iii). Put simply, the alternative rebate formula ties the inflationary penalty to not only increases in the price of the "line extension" drug itself, but also to increases in prices of any other drug in the "line."

For example, suppose Manufacturer X produces both "Drug A" and "Drug B," a line extension of Drug A. Drug A has an additional rebate of 50 percent of

AMP because increases in its original price have outpaced inflation. If Manufacturer X introduces Drug B in 2021 and sells 100,000 units at $100 per unit, the basic rebate—using the statutory minimum rebate percentage—would total $2,310,000 ($100 x 23.1% x 100,000 units). But as a line extension, Drug B is subject to the alternative rebate calculation, which increases Drug B's rebate by Drug A's 50 percent additional-rebate rate, for a total of $7,310,000 ($100 x 73.1% x 100,000 units)—roughly three times the standard rebate. Manufacturer X must pay this larger rebate amount even though it is driven by Drug A's pre-2020 pricing history, and even though a new market entrant selling competitor products of Drug A and Drug B could price them the same as Manufacturer X does, without needing to pay the higher rebate amount.

### C. FDA's Expertise on Drug Classifications

FDA is the federal agency charged with regulating drugs and protecting public health by ensuring the safety, efficacy, and security of drugs. FDA, *What We Do*, https://www.fda.gov/about-fda/what-we-do. FDA's statutory authority includes approval of new drugs before they may be introduced into interstate commerce, 21 U.S.C. § 355(a), and FDA regulations govern applications for approval to market new drugs. 21 C.F.R. pt. 314. FDA's Center for Drug Evaluation and Research ("CDER") also assigns New Drug Application ("NDA") classification codes to new drug applications based on the characteristics of the products in the applications.

CDER, FDA, Manual of Policies & Procedures 5018.2, *NDA Classification Codes* 1–2 (rev. Jan. 28, 2022), https://www.fda.gov/media/94381/download. FDA publishes a list of the classification codes used for categorizing new drug applications in its Manual of Policies & Procedures ("MAPP"). FDA, *NDA Classification Codes*, MAPP § 5018.2 (Dec. 8, 2022), https://www.fda.gov/media/94381/download ("2022 MAPP").

Relevant to this appeal, the MAPP provides a classification code for "new formulation," which the MAPP defines to include certain "product[s] involv[ing] changes in *inactive* ingredients." *See* 2022 MAPP § 5018.2, at 4 (emphasis added). This was true already by 2009, before Congress adopted the 2010 MDRP amendments. *See* Administrative Record at 8, JA__ ("2009 MAPP"); *see also infra*.

Given FDA's expertise, CMS routinely defers to FDA on technical questions of drug classification. For example, in 42 C.F.R. § 447.502, CMS defined National Drug Code as "the numerical code maintained *by the FDA* that includes the labeler code, product code, and package code." (emphasis added). Similarly, in 42 C.F.R. § 447.514(a), CMS deferred to FDA's identification of pharmaceutically and therapeutically equivalent drugs. And in Manufacturer Release No. 102 (Nov. 17, 2016), CMS relied on FDA information to determine "whether a drug is an abuse-deterrent formulation, and thus excluded from the definition of line extension for the purposes of the MDR program."

### D. CMS's Initial Rulemaking Excluded Drugs of a New Strength From the Definition of "Line Extension"

In 2012, CMS issued a proposed rule ("2012 Proposed Rule") defining "line extension." Medicaid Program; Covered Outpatient Drugs, 77 Fed. Reg. 5318, 5360 (Feb. 2, 2012). Specifically, CMS proposed the following definition:

> a single source or innovator multiple source drug that is in an oral solid dosage form that has been approved by the FDA as a change to the initial brand name listed drug in that it represents a new version of the previously approved listed drug, such as new ester, a new salt or other noncovalent derivative; a new formulation of a previously approved drug; a new combination of two or more drugs; or a new indication for an already marketed drug.

*Id.* CMS expressly recognized that it did "not have the ability to identify whether a drug is a line extension," and proposed instead to rely on the categories that FDA uses to classify new drug applications. *Id.* at 5339. According to CMS, FDA's classifications described "new formulation of a previously approved drug" as representing "a change in the *inactive ingredients* (excipients) in a drug *but no change in the amount of active ingredient*." *Id.* (emphases added). Put differently, CMS's 2012 Proposed Rule did not treat a change to the "amount of active ingredient" (i.e., strength) as a "new formulation." *Id.* Indeed, CMS specifically proposed to exclude "a new strength of the initial brand name drug from the definition of a line extension drug" and stated that it "adopted this policy in order to capture all new formulations . . . consistent with [its] understanding of the line extension provisions" adopted by Congress in 2010. *Id.* at 5338.

This rulemaking process lingered for years, and in 2016, CMS issued a final rule stating explicitly that CMS did "not consider new strengths of the same formulation of the initial brand name listed drug to be a line extension." Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5267 (Feb. 1, 2016) ("2016 Final Rule"). CMS further stated that "if the only change to a drug is the strength, without any change to the formulation of the drug, [the statute] does not contemplate that a new strength is a line extension drug." *Id.* Reiterating the point, CMS specifically confirmed that "[i]f the sole difference between a drug and the corresponding initial brand name listed drug is the strength, then the drug . . . will not be subject to the alternative [rebate] calculation for line extension drugs." *Id.* Although the 2016 Final Rule did not codify a regulatory definition of "line extension," CMS directed manufacturers to "rely on the statutory definition of line extension," which CMS had made clear it understood did not include new drug strengths. *Id.* at 5265.

In early 2019, CMS issued an interim final rule, which again reiterated CMS's 2016 reading of "new formulation" reflected in the 2016 Final Rule. Medicaid Program; Covered Outpatient Drug; Line Extension Definition; and Change to the Rebate Calculation for Line Extension Drugs, 84 Fed. Reg. 12130, 12132 (Apr. 1, 2019) ("2019 IFR"). And CMS once again "reiterated" "that manufacturers are to rely on the statutory definition of line extension" and "are permitted to use

reasonable assumptions in their determination of whether their drug qualifies as a line extension drug." *Id.*

### E. The 2020 Rule Changed CMS's Long-Held View On Strength Changes

In June 2020, CMS abruptly changed course on whether a change in drug strength constitutes a line extension. *See* Medicaid Program; Establishing Minimum Standards in Medicaid State Drug Utilization Review (DUR) and Supporting Value-Based Purchasing (VBP) for Drugs Covered in Medicaid, Revising Medicaid Drug Rebate and Third Party Liability (TPL) Requirements, 85 Fed. Reg. 37286, 37319 (June 19, 2020) ("2020 Proposed Rule"). For the first time, CMS proposed to define "new formulation" to mean "[e]xtended release formulations; *changes in* dosage form, *strength*, route of administration, ingredients, pharmacodynamics, or pharmacokinetic properties; changes in indication accompanied by marketing as a separately identifiable drug . . . ; and combination drugs . . . ." *Id.* (emphases added). Attempting to justify its abrupt regulatory about-face, CMS noted only that "[t]he statutory definition of line extension *does not expressly exclude* a new strength of a drug," *id.* at 37295–96 (emphasis added).

Commenters immediately raised concerns that the proposed definition was contrary to the statutory language and congressional intent. *See, e.g.*, JA__[AR33345–47] (addressing inconsistencies between 2020 Proposed Rule and language and intent of statute); JA__[AR59714] (same). Commenters specifically

highlighted that treating new drug strengths as line extensions would disincentivize manufacturers from developing lower strength drugs that benefit the pediatric patient population—an already economically challenging population to serve. *See, e.g.*, JA__[AR25220–21] (explaining that significant research and development goes into developing new strengths, including lower dosages for pediatric patients, and that CMS's proposed change "disincentivize[s] manufacturers from investing in the development of these products"); JA__[AR25039-40] (same).

Several commenters also expressed concerns about CMS's interpretive about-face, including that the 2020 Proposed Rule contradicted CMS's prior statements and undermined manufacturers' reasonable reliance. *See, e.g.*, JA__[AR9401] (emphasizing that manufacturers relied on CMS's prior statements and that any new definition of line extension should apply "only to new products approved by FDA after the effective and/or compliance date"); JA__[AR57131] (explaining that manufacturers make significant investments to develop new drug strengths and need to "recoup[] the company's investments").

Relatedly, commenters highlighted concerns with a retroactive application of the new definition to drugs already approved and marketed. For example, one commenter stated that "applying the definition retrospectively would violate principles of fair notice because neither the statute nor any regulatory action gave manufacturers notice that CMS would adopt the new and broad definition" and "it

would violate due process for CMS to apply this new definition and new interpretation retrospectively" in light of prior agency statements on what qualifies as a line extension. JA__[AR52021]; *see also* JA__[AR25043] (asserting that manufacturers that relied on the statutory meaning "in good faith to identify line extension products should not be subject to costly retrospective changes").

On December 31, 2020, CMS nevertheless finalized the 2020 Rule, which defined "new formulation" as "a change to the drug, including, but not limited to: an extended release formulation or other change in release mechanism, a change in dosage form, strength, route of administration, or ingredients." 85 Fed. Reg. at 87101–02; *see* 42 C.F.R. § 447.502. Tellingly, the 2020 Rule admitted that certain drugs "would likely be classified as line extensions" under the new rule that "would not now be currently classified as line extensions under the statutory definition of line extension." 85 Fed. Reg. at 87096.

In a section entitled "Prospective Implementation," CMS stated that the new formulation definition "will not be applied retrospectively. These definitions become effective for all drugs in the MDRP beginning on January 1, 2022." *Id.* at 87043. Furthermore, CMS advised that prior to January 1, 2022, manufacturers "may continue to rely on reasonable assumptions to determine if their drug is a new formulation in order to comply with the statutory requirements and to use for potential future review of compliance prior to the effective date." *Id.* at 87043–44.

But, on November 7, 2023, CMS published Manufacturer Release No. 119 ("Release"). CMS, Manufacturer Release No. 119, p. 11 (Nov. 7, 2023), https://www.medicaid.gov/prescription-drugs/downloads/mfr-rel-119.pdf. The Release stated that "CMS advises manufacturers that all drugs . . . be evaluated to determine whether they satisfy the applicable regulatory definitions and whether they must be reported as line extensions," regardless of whether the drug had previously satisfied the definition of "line extension" prior to the 2020 Rule's effective date. *Id.*

## II. FACTUAL BACKGROUND

### A. Chiesi

Chiesi is a specialty pharmaceutical company committed to developing and delivering innovative therapies for rare diseases. JA__[Compl. ¶ 14]. In 2019, Chiesi became a certified B Corp—a recognition for companies that "meet high standards of social and environmental performance, accountability and transparency."[3] Consistent with its mission to improve the quality of human life by acting responsibly toward society and the environment, Chiesi has made significant investments in the development of rare disease drugs.[4]

---

[3] Chiesi, *Sustainability*, https://www.chiesi.com/en/sustainability (last visited Aug. 3, 2026).

[4] *See* Chiesi, *About Us*, https://www.chiesiusa.com/our-company/ (last visited Aug. 1, 2026).

## B. Ferriprox

One of Chiesi's rare disease drug portfolios is Ferriprox® (deferiprone). JA__[SAR2–3]. Ferriprox's active ingredient, deferiprone, is an iron chelator designed to reduce excess body iron in patients with transfusional iron overload resulting from chronic, transfusion-dependent conditions like thalassemia syndrome, sickle cell disease, and other anemias. JA__[Compl. ¶ 15]. Ferriprox® (deferiprone) 500 mg Tablets ("Ferriprox 500-mg") was approved on October 14, 2011. JA__[SAR15]. Following the approval of Ferriprox 500-mg, additional products were developed and approved to fulfill specific patient or therapeutic needs, including Ferriprox® (deferiprone) 100 mg/ml Oral Solution ("Ferriprox Solution") (approved Sept. 9, 2015), Ferriprox® (deferiprone) 1000-mg Tablets, three times daily ("Ferriprox 1000-mg TID") (approved July 25, 2019), and Ferriprox® (deferiprone) 1000-mg Tablets, two times daily ("Ferriprox 1000-mg BID") (approved May 19, 2020). JA__[SAR2]. The Ferriprox Solution was specifically developed for pediatric patients and other patients who have difficulty taking oral tablets, such as younger children. JA__[SAR30]. The Ferriprox 1000-mg TID was developed to improve medication adherence, as fewer pills per dose are needed for Ferriprox 1000-mg TID than for Ferriprox 500-mg. JA__[SAR3–4]. The Ferriprox 1000-mg BID was developed to further improve adherence by reducing the

unpleasant side effects that can come from taking a midday dose under the Ferriprox 1000-mg TID regimen. JA__[SAR3–4].

On January 8, 2020, Chiesi's parent company, Chiesi Farmaceutici S.p.A., finalized its acquisition of the Ferriprox therapies. *See* JA__[Compl. ¶ 17]. All of the Ferriprox products were marketed, priced, and sold before CMS proposed the new definition of new formulation that includes a change in drug strength. JA__[SAR4].

Chiesi participates in the MDRP. In accordance with the statutory language, Chiesi has always reported Ferriprox 1000-mg BID as a line extension of Ferriprox 1000-mg TID, *see* JA_ [SAR6-9]. Ferriprox 1000-mg BID functions as an extended release version of the Ferriprox 1000-mg TID. But, relying on Congress's choice to adopt a term of art when it amended the rebate statute in the Affordable Care Act and CMS's long-standing recognition that new drug strengths were not "line extensions" under the statute, Chiesi has never reported Ferriprox Solution or Ferriprox 1000-mg TID as line extensions of Ferriprox 500-mg. *See* JA__[SAR2, 5–8].

On July 28, 2023, four months before CMS issued Manufacturer Release No. 119, Chiesi wrote to CMS and explained its rationale for reporting Ferriprox in this manner. *See* JA__[SAR1–9].

## III. PROCEDURAL BACKGROUND

On January 29, 2024, Plaintiff filed this action to challenge the 2020 Rule and Manufacturer Release No. 119 under the Administrative Procedure Act ("APA"). The parties filed cross-motions for summary judgment. On August 27, 2025, the district court granted Defendants' motion and denied Plaintiff's cross-motion. JA__[Mem. Op. at 21]. Relevant to this appeal, the district court found that the 2020 Rule aligned with the best reading of the statute, notwithstanding Congress's choice to define a "line extension" in terms of a "new formulation," an established term with a more limited technical definition, and that the 2020 Rule was not retroactive in effect, even though the rebate liability for new product strengths depends on pricing decisions long before CMS re-defined "line extension" to include new drug strengths. JA__[Mem. Op. at 8-11, 14-16]. Plaintiff timely appealed. JA__[Notice of Appeal].

## SUMMARY OF THE ARGUMENT

The district court erred in granting summary judgment in the government's favor. Its holding leaves intact a rule that is both contrary to the statutory meaning of "new formulation" and impermissibly retroactive because it attaches new legal consequences to past pricing decisions. This Court should reverse the district court's judgment and set aside the 2020 Rule and the portions of the Release giving it retroactive effect.

A. CMS's 2020 definition of "new formulation" to encompass changes to drug strength is contrary to the best reading of the term in the statutory context. Congress used the technical term "new formulation" of a drug to adopt FDA's understanding of the term, which reflects a change in the inactive ingredients, but not changes in the amount of active ingredients. Besides FDA's preexisting definition of the term, the next best evidence of how Congress would have understood the phrase is CMS's own initial understanding of "new formulation" as excluding drug strength changes, in accordance with FDA's definition, from the provision's inception until abruptly changing its position in 2020. That construction of the term is further confirmed by the omission of the word "strength" in the statutory definition of line extension, despite Congress's repeated use of that term elsewhere in the MDRP statute.

Even if there was any doubt, confining the term "new formulation" to its established technical meaning is necessary to avoid significant retroactivity concerns posed by CMS's expansive interpretation. Congress recognized in enacting the MDRP that increasing liability based on past pricing decisions can impose a retroactive effect on preexisting drugs. That is precisely what CMS's interpretation would do here, by tying manufacturers' liability for the additional rebate amount to the price of drugs set long before the enhanced liability was adopted. But Congress is presumed not to legislate retroactively unless that intent is clear. And here,

Congress did not express any clear intent for the line extension provision to operate retroactively as to drug strength changes, as evidenced by the fact that for the first decade CMS did not understand "new formulation" to cover drug strength changes.

Rather than giving "new formulation" FDA's contemporaneous, technical definition as Congress intended, and as CMS understood it at the time, CMS and the district court stretched the term past the breaking point to encompass virtually any change to a drug. Both CMS and the district court began from the flawed premise that the MDRP delegated authority to CMS to define the term line extension. The district court then failed to properly apply canons of statutory construction by identifying generic dictionary definitions for each component word of the term in isolation and then combining them into a single definition, rather than construing the phrase in its context. The district court's resulting definition of "new formulation" sweeps too broadly to be correct, as it captures drug changes that even CMS has acknowledged should not be regarded as line extensions.

B. The 2020 Rule is itself impermissibly retroactive and denies Chiesi fair notice. Despite the lack of express congressional authorization to promulgate retroactive MDRP rules, the 2020 Rule imposes exactly the sort of retroactive effect that Congress sought to avoid in the 1990 enactment of the MDRP. By expanding the definition of line extensions to include new drug strengths, the 2020 Rule ties rebate calculations for new drug strengths to the original price of Ferriprox 500-

mg—a price set long before the Rule's issuance. A competitor entering the market now would not have to pay the same rebates even if it priced its competing product at the same price as Chiesi's, which demonstrates that the 2020 Rule applies differently to Chiesi due to acts taken before the 2020 Rule's adoption. What is more, the 2020 Rule retroactively changed CMS's long-standing view of the statute that drug strength changes did not constitute a new formulation under the MDRP, a view upon which CMS expressly invited Chiesi to rely when determining first whether to acquire Ferriprox and then what to report as a line extension. Thus, Chiesi lacked fair notice that CMS would change its position on drug strength changes.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment on a claim under the APA. *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325-26 (D.C. Cir. 2017). The APA requires courts to hold unlawful and set aside agency actions, findings, and conclusions if they are contrary to law, arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A), (E). When reviewing an agency's interpretation of a statute, the Court owes no deference to the agency and "must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 410-13 (2024). In determining the best reading of the term, courts interpret statutes

according to their meaning at the time of enactment. *Id.* at 388; *see also Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020).

The Court cannot construe a statutory grant of legislative rulemaking authority "to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Absent such express authorization, the Court must determine whether the rule has "retroactive effect." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). If so, the rule is "impermissibly retroactive." *Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. EPA*, 72 F.4th 284 (D.C. Cir. 2023).

## ARGUMENT

### I. THE 2010 "LINE EXTENSION" AMENDMENT DOES NOT INCLUDE CHANGES IN STRENGTH

#### A. Congress defined "line extensions" in terms of a "new formulation" of a drug, a technical term of art with an established meaning, which CMS recognized for a decade after the 2010 amendment

The Medicaid statute defines a "line extension" as a "new formulation" of a drug. The statute provides no further definition and instead offers a single example of what Congress considered to be a new formulation: "an extended release formulation." 42 U.S.C. § 1396r-8(c)(2)(C)(iii). Because the statute does not otherwise define (or delegate authority to the agency to define) "new formulation," Congress is best understood to have adopted the term's established technical meaning, referring to changes in inactive ingredients, not the amounts of active

ingredients, i.e., changes in strength. This definition is confirmed by CMS's longstanding interpretation of "new formulation" and the broader statutory context.

### 1. The technical meaning of "new formulation," which FDA had already established before 2010, does not include changes in the amount of active ingredients

"[I]t is a 'cardinal rule of statutory construction' that when Congress employs a term of art, it 'presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" *FAA v. Cooper*, 566 U.S. 284, 292 (2012) (citation omitted). This rule of construction applies when, as here, Congress uses a technical or scientific term in a statute regulating a specialized industry. *See, e.g.*, *Van Buren v. United States*, 593 U.S. 374, 388 n.7 (2021) (recognizing "the specialized meaning of 'access' in the computer context" when interpreting a statute about computers); *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 13 (D.C. Cir. 2011) (recognizing that "specialized use" of phrases that are "addressed to specialists . . . must be read by judges with the minds of specialists" (citation omitted)). "When a statutory term is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (citation and internal quotation marks omitted); *see also United States v. Hansen*, 599 U.S. 762, 778 (2023) (same).

The MDRP statute is a technical statute regulating drug pricing and rebates, a field that often borrows from the closely related field of drug classifications,

regulated by FDA. *See supra* 12. In defining "line extension," Congress borrowed the technical term "new formulation" directly from FDA, adopting a technical definition of the term which covers only changes in inactive drug ingredients, not changes in the amount of active ingredients. *See Bondi v. VanDerStok*, 604 U.S. 458, 481 (2025) ("[C]ontemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning."). Agency interpretation may be "especially informative" where, as here, "it rests on factual premises within [the agency's] expertise." *Loper Bright*, 603 U.S. at 402 (citation omitted) (alteration in original).

Notably, Congress did not delegate authority to the Department of Health and Human Services ("HHS") to define the term "new formulation." An agency possesses regulatory authority to define statutory terms only where the statute "expressly delegate[s]" it. *Loper Bright*, 603 U.S. at 395 (citation omitted). Congress made such a delegation elsewhere in the MDRP statute, providing that what constitutes an "abuse-deterrent formulation of the drug" is "determined by the Secretary." 42 U.S.C. § 1396r-8(c)(2)(C). The statute contains no similar language regarding a "new formulation." Accordingly, this Court must use its independent judgment, employing traditional tools of statutory construction, to determine the best reading of that term. *See Loper Bright*, 603 U.S. at 402.

By 2009, before Congress added the line extension provision in 2010, FDA had already defined "New Formulation" to mean a "change[] in inactive ingredients," not a change in the amount of active ingredients—a definition that FDA has maintained. 2009 MAPP; *see also* 77 Fed. Reg. at 5339 (invoking 2012 MAPP definition of new formulation as involving changes only to inactive ingredients); FDA, *NDA Classification Codes*, MAPP § 5018.2, at 4 (Nov. 4, 2015) ("2015 MAPP") https://web.archive.org/web/20191213212542/https://www.fda.gov/media/94381/download (same); 2022 MAPP (same). While the 2009 MAPP made this definition of "New Formulation" explicit, the principle was established before then. Other provisions of the MAPP, going back to at least 2006, confirm that FDA has long viewed changes to strength and new formulations as having distinct technical meanings. *See* FDA, *NDA Classification Codes*, MAPP § 5210.8, at 3 (July 30, 2006), web.archive.org/web/20120302021525/http:/www.fda.gov/downloads/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ManualofPoliciesProcedures/ucm079776.pdf (separately categorizing "changes in formulation" and "new strengths" as different types of drug modifications).

CMS's own statements contemporaneous with the 2010 MDRP amendment confirm that Congress would have understood "new formulation" in the way FDA had defined it. *See supra* 13. In its 2012 rulemaking, CMS expressly incorporated

"FDA's list of Chemical Types as an indicator for line extension drugs," 77 Fed. Reg. at 5338-39. Based on FDA's established understanding, CMS took the position that the term "new formulation" of a drug meant "a change in the inactive ingredients (excipients) in a drug but no change in the amount of active ingredient." *Id.* at 5339. CMS deferred to this view for years. In 2016, it again acknowledged that the MDRP statute does not contemplate that a mere change to the strength of a drug constitutes a line extension. *See, e.g.*, 81 Fed. Reg. at 5267. As late as 2019, CMS continued to instruct manufacturers to "rely on the statutory definition of line extension," which CMS said, in lockstep with FDA's reading, excluded new strengths. 84 Fed. Reg. at 12132. CMS's original construction of the statute, consistent with FDA's established meaning, is the correct one. CMS did not waver from this position until its "late breaking" reversal in the 2020 Rule. *Loper Bright*, 603 U.S. at 390 n.3.

That Congress would have adopted FDA's understanding on a technical issue of drug classification in enacting the MDRP amendments is hardly surprising, given FDA's expertise. Indeed, CMS itself routinely defers to FDA on technical drug classification matters in other MDRP contexts. *See supra* 12. As one further example from the payment context, CMS expressly incorporated FDA's current MAPP classification for "Type 5 NDA—New Formulation or Other Differences," which defines new formulations as involving changes to *inactive* ingredients. *See* 42 C.F.R. § 413.234(e)(2)(i)(A) (incorporating MAPP's "Type 5 NDA—New

Formulation or Other Differences" in end-stage renal disease drug payment regulations).

Thus, the MDRP statute is best read as adopting the well established and well understood meaning of "new formulation" when it chose to legislate using those words—to mean only changes to inactive ingredients, and not to drug strength changes—as confirmed by the fact that CMS interpreted the statute in precisely that way for the decade that followed, until it pulled an abrupt U-turn and adopted a retroactive rule directly to the contrary.

#### 2. The broader statutory context confirms that a drug strength change is not a new formulation

"[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Here, Congress's intention to adopt FDA's understanding of "new formulation" excluding strength changes is confirmed by the statutory context.

Nowhere in the definition of "line extension" did Congress mention drug strength changes. But Congress expressly referenced drug "strength" throughout § 1396r-8 when that was what Congress intended. "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 537 (1994) (quoting *Chicago v. Env't. Def. Fund*, 511 U.S. 328, 338

(1994)). Had Congress intended to include drug strength changes in the definition of "new formulation," it would have said so explicitly, as it did elsewhere throughout the statute—"strength" appears 19 times throughout the MDRP statute. *See* 42 U.S.C. § 1396r-8(b)(2)(A), (c)(1)(A)(i)–(ii), (c)(2)(A)(i)–(ii), (c)(2)(C)(iii)(II)–(III), (c)(2)(D), (c)(3)(A)(i)–(ii), (c)(3)(C)(i), (c)(4)(B)(ii)(III)(aa)–(bb).

The MDRP's treatment of "dosage form and strength" as two distinct variables requiring separate calculations, *id.* § 1396r-8(c)(2)(C)(iii), bolsters this conclusion. This statutory structure demonstrates that Congress understood "strength" to be a distinct characteristic from the "form" of a drug. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))). Had Congress intended to include changes in strength within the meaning of "new formulation" it would have said so, especially when drug strength changes were viewed by FDA as outside the scope of "new formulation," and Congress took pains to separately identify drug strength elsewhere.

### B. Even if the 2010 Amendment Was Not Clear on Its Own Terms, New Strengths Would Be Excluded Under the Presumption Against Retroactivity

Even if there were some doubt that Congress intended to borrow FDA's established meaning, the Court should construe the term "new formulation" as excluding new strengths to avoid construing the MDRP statute as having a retroactive effect that Congress did not intend. "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* The Due Process Clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Id.* at 266.

As such, Congress cannot legislate retroactively unless it speaks clearly. *See Quantum Ent. Ltd. v. U.S. Dep't of Interior*, 714 F.3d 1338, 1342 (D.C. Cir. 2013) (holding that Congress must have "'express[ly] command[ed]' that [the statute] apply retroactively") (quoting *Landgraf*, 511 U.S. 244, 280 (1994)). "[C]ourts read laws as prospective in application unless Congress has *unambiguously* instructed retroactivity." *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (emphasis added). The requirement for Congress to speak clearly about retroactivity is strengthened by the

constitutional avoidance doctrine, under which the Court must "construe the statute to avoid constitutional difficulties if such a construction is not plainly contrary to the intent of Congress." *Chamber of Com. of U.S. v. Fed. Election Comm'n*, 69 F.3d 600, 605 (D.C. Cir. 1995).

Absent an "express command" for a statute to apply retroactively, "the court must determine whether the new statute would have retroactive effect." *Landgraf*, 511 U.S. at 280. "If the statute would operate retroactively, [the] traditional presumption teaches it does not govern absent clear congressional intent favoring such a result." *Id.* This Court will "avoid a particular reading of a statute" if it would render the statute retroactive without clear congressional intent. *EB5 Holdings Inc. v. Edlow*, 166 F.4th 1106, 1114 (D.C. Cir. 2026).

Congress's approach to the inflation-based additional rebate in the 1990 enactment of the MDRP reflects an understanding that imposing new liability on manufacturers based on the past pricing of drugs that were already marketed would be retroactive. Construing "new formulation" in the 2010 amendment to cover drug strength changes would impose the same sort of retroactive effect, by tying a manufacturer's liability for a new drug strength to price increases for the original drug and any other drug strength implemented before that amendment. But Congress did not clearly provide for a retroactive application to drug strength

changes, as evidenced by CMS's decade-long understanding that drug strength changes were not covered by the statute.

### 1. Tying liability to a price set prior to the 2010 amendment imposes a retroactive effect

The district court did not consider the presumption against retroactivity as relevant, because it concluded that the 2010 Amendment was not retroactive in effect, JA__[Mem. Op. at 14-15], but that was error, as demonstrated by how Congress took care to avoid any retroactive application of the original 1990 MDRP statute. A statute has a retroactive effect if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Quantum*, 714 F.3d at 1342 (quoting *Landgraf*, 511 U.S. at 280). "[T]he *extent* of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored." *Landgraf*, 511 U.S. at 284-85 (emphasis in original). Determining retroactivity is not a question of labels; it is a functional determination that comes "at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* at 269-70.

Determining the amount of a manufacturer's rebate liability on its pricing decisions from before the rule's enactment presents just this kind of retroactivity. If two manufacturers sell competing drugs at the same price, but one owes three times

the rebate liability of the other due to pre-enactment pricing decisions, the new law imposes retroactive liability on that manufacturer for its pre-enactment conduct. Congress recognized, and sought to avoid, precisely this kind of retroactive application of the initial inflation-based rebate when it enacted the MDRP in 1990. In crafting the inflation-based adjustment rebate, Congress was careful to clarify that for drugs that were then on the market, drug price increases would be measured based on the AMP "in effect on October 1, 1990"—*i.e.*, when the statutory liability was created—not the drug's price when initially marketed. Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4401. By setting the reference price at the date of the statute's enactment, Congress avoided any retroactivity concerns that would arise from tying prospective liability to pricing decisions made *before* the creation of the additional rebate.

Interpreting "new formulation" to encompass changes in drug strength raises precisely the same retroactivity concerns. Because the alternative rebate calculation for line extensions is generally based on the drug price as of the date the original strength drug was marketed, 42 U.S.C. § 1396r-8(c)(2)(C), treating new drug strengths as line extensions imposes higher rebate requirements on manufacturers based on drug pricing decisions made before the 2010 amendment was enacted. As in *Landgraf*, this increase in rebate liability is a legal consequence attached to the past conduct of drug manufacturers. *Landgraf*, 511 U.S. at 284-85.

This retroactive effect is evident from the differing rebates manufacturers would face under the district court and CMS's construction depending on whether they launched new drug strengths before or after the 2010 amendment. Consider a new manufacturer introducing a drug after the 2010 amendment. The new manufacturer would give the original drug a higher starting price (and adjust it only for inflation), so that any later launched product with a new drug strength would not be subject to an alternate rebate obligation. But a manufacturer that already introduced drugs before the 2010 amendment lacks this ability. The pricing history of its original strength drug—set before the 2010 Amendment—would dictate rebate calculations for new drug strengths, and there is no way for the old manufacturer to undo the effects of prior pricing decisions. Competing products, priced identically, could be subject to dramatically different rebate liabilities based solely on one manufacturer's pre-amendment conduct. Applying different liability to two regulated parties, based solely upon conduct that one of them took before a change in the law, is the definition of a retroactive statute.

### 2. Congress did not express a clear intent to make the 2010 amendment apply retroactively to new strengths

Because applying the line extension provision to reach drug strengths has a retroactive effect, that reading is only permissible where Congress "unambiguously instructed." *Vartelas*, 566 U.S. at 266. "The standard for finding such unambiguous direction is a demanding one." *INS v. St. Cyr*, 533 U.S. 289, 316–17 (2001) (quoting

*Lindh v. Murphy*, 521 U.S. 320, 328 n.4 (1997)). Courts have "found truly 'retroactive' effect adequately authorized by statute" only where the statutory language "was so clear that it could sustain only one interpretation." *Id.*

Here, Congress did not clearly mandate that the line extension provision should operate retroactively as to drug strengths. The amendment merely created a separate alternative rebate calculation for "line extension[s]" that the statute defines as a "new formulation of the drug, such as an extended release formulation," *see* 42 U.S.C. § 1396r-8(c)(2)(C), without clearly addressing that it intended to apply to strength changes for drugs marketed prior to enactment.

That the statute is at most ambiguous on this point is apparent from CMS's own repeated acknowledgments that the phrase "new formulation" did not apply to drug strength changes. *See* 77 Fed. Reg. at 5339 (2012 Proposed Rule); 81 Fed. Reg. at 5267 (2016 Final Rule stating the same); 84 Fed. Reg. at 12132 (2019 IFR reiterating CMS's 2012 and 2016 positions). The statute cannot possibly reflect a clear Congressional intent to impose retroactively liability as to new drug strengths if the relevant agency read the statute not to apply to drug strength changes at all for a decade.

Reading the line extension provision to reach new drug strengths would present a paradigmatic case of retroactive application, without a clear statement from Congress. Thus, even if it were not independently the better reading of the term,

under the clear statement rule, this Court should still confine the "line extension" term to its technical meaning to avoid reading the statute to create an unintended retroactive effect as to new drug strengths.

### C. CMS's and the District Court's Reading of "New Formulation" Finds No Basis in the Statutory Text

Notwithstanding the more limited meaning Congress adopted when it chose to use the technical term "new formulation" to define "line extension" and the clear retroactivity problems created by a broader reading, the district court upheld CMS's expansive construction of "new formulation" to include changes in drug strength. That decision reflects legal error. As previously noted, the district court did not recognize the 2020 Rule as raising any issue of retroactivity, *see* JA___ [Mem. Op. at 14-15], even though Congress, in 1990, plainly recognized that imposing increased liability on present sales based on pre-enactment conduct *would be* retroactive legislation. On that basis alone, the district court's analysis cannot be affirmed. Beyond that error, the court erroneously broke apart the term "new formulation" into its component words, looked each one up in a dictionary in isolation, and stitched them back together into a single definition. This Dr. Frankenstein approach to statutory construction does not provide the single, best reading of the statutory term, and the resulting definition would encompass drug changes that, until its regulatory about-face, CMS agreed were plainly beyond the

scope of the statute. The district court's analysis cannot, therefore, overcome the arguments above.

### 1. CMS and the district court began from the flawed premise that CMS has discretion to interpret "new formulation" expansively

Both CMS and the district court began their interpretation of "new formulation" from the unfounded assumption that Congress intended the term to be defined expansively. Because the statute defines "new formulation" by identifying an "extended release formulation as one example, prefaced with the phrase 'such as,'" the district court assumed this meant the statute signals a "capacious" and "broad scope." JA__[Mem. Op. at 8]; *see also* 85 Fed. Reg. at 87035. CMS likewise reasoned that the use of the phrase "such as" meant that Congress did not "intend[] to limit the definition to certain types of changes to a drug," *id.*, and thus the absence of an "express[] exclu[sion]" of drug strength changes means Congress intended to treat new strengths as line extensions, *id.* at 87040.

However, the premise underlying this interpretation—that by not identifying an exhaustive list of examples, Congress was giving CMS carte blanche to treat any change as a "new formulation"—is flawed. As noted above, the statute does not expressly delegate authority to CMS to define "new formulation." *Loper Bright*, 603 U.S. at 395. Although "such as" indicates that a list is illustrative, *see Doe v. Sec. & Exch. Comm'n*, 28 F.4th 1306, 1314 (D.C. Cir. 2022), it does not follow that

"new formulation" means essentially *any* change CMS concludes. To the contrary, the inclusion of "an extended release formulation" as an example "cabin[s] the contextual meaning of" new formulation under the principle of *noscitur a sociis*. *Yates v. United States*, 574 U.S. 528, 543 (2015); *see also United States v. Williams,* 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."). An "extended release formulation" is principally a change in how the drug product is designed to employ inactive ingredients to deliver the active ingredient over time. By contrast, a strength change is a quantitative change to the "amount of drug substance contained in, delivered, or deliverable from the drug product." 21 C.F.R. § 314.3; *see also* FDA, Drugs@FDA Glossary of Terms, https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms ("The strength of a drug product tells how much of the active ingredient is present in each dosage.").

A change in a drug's strength—the amount of active ingredient—can fundamentally alter the drug's intended uses and effects. For example, intravenous immunoglobulin at low doses bolsters the immune system but at high doses modulates the immune system. *See* S. V. Kaveri et al., *Intravenous immunoglobulins in immunodeficiencies: more than mere replacement therapy,* 164 Clinical & Experimental Immunology 2 (June 2011), https://pmc.ncbi.nlm.nih.gov/articles/PMC3087903/. Tofacitinib treats rheumatoid arthritis at low doses but

ulcerative colitis at higher doses. *See* Inderbir S. Padda et al., *Tofacitinib*, StatPearls (July 3, 2023), https://www.ncbi.nlm.nih.gov/books/NBK572148/. The common drug warfarin, which at lower doses is an anticoagulant, can be used as a rat poison at higher doses. *See* Gregory B. Lim, *Warfarin: from rat poison to clinical use*, Nature Reviews Cardiology (Dec. 14, 2017), https://www.nature.com/articles/nrcardio.2017.172.

Thus, CMS's and the district court's failure to ground their expansive construction of "new formulation" in the text of the statute can lead to absurd results.

**2. The district court erred in piecing together dictionary definitions of the terms "new," "formulation," and "formula"**

Instead, the district court sought support for CMS's interpretation by constructing a patchwork definition made up of the separate dictionary definitions of "new," "formulation," and "formula." JA__[Mem. Op. at 9]. Stitching these definitions together, it concluded that "a 'new formulation' arises when a drug is prepared in a way distinct from prior version[s]." *Id.* [Mem. Op. at 9]. This approach suffers from at least two independent defects.

*First*, the district court's approach was flawed from inception. "[L]ongstanding principles of statutory interpretation" hold that a court should not "simply split statutory phrases into their component words, look up each in a dictionary, and then mechanically put them together again." *Bostock*, 590 U.S. at

789 (Kavanaugh, J., dissenting). Rather, the words of a statute taken "together may assume a more particular meaning than those words in isolation." *FCC v. AT & T Inc.*, 562 U.S. 397, 406 (2011). The term "new formulation" functions as a cohesive technical term that cannot be disassembled into its component parts and then reconstituted to mean something else. Yet, the district court did precisely that here.

*Second*, as even the district court recognized at oral argument, the Fourth Circuit similarly compiled a dictionary definition of "new formulation" in *Vanda Pharmaceuticals, Inc. v. CMS*, 98 F.4th 483, 492 (4th Cir. 2024), that the district court described as circular and, at the very least, is different than the definition that the court below arrived at following the same flawed approach. JA__[Hr'g Tr. at 6:7-9]. In *Vanda*, the court used a dictionary definition that merely defined "new formulation" as a "different formula." *Vanda*, 98 F.4th at 492. But that definition did not establish what it means to have a different formula and therefore provided no greater clarity on the meaning of "new formulation." The same is true of the district court's definition—a drug "prepared in a way distinct from prior versions" does not tell anyone much of anything at all. JA__[Mem. Op. at 9].

#### 3. CMS's definition encompasses even changes that all agree are beyond the scope of the statute

The error in the district court's stitched-up definition is further evident from its broad sweep, which would reach essentially every change to a drug. Treating any

drug that "is prepared in a way distinct from prior versions" as a new formulation, JA__[Mem. Op. at 9], essentially covers *any* change to *any* drug.

This would encompass even changes to the drug's active ingredient. For example, changing a drug's active ingredient from ibuprofen to acetaminophen would be a "prepar[ation] in a way distinct from prior versions." JA__[Mem. Op. at 9]. But even CMS would not argue that Tylenol (acetaminophen) is a line extension of Advil (ibuprofen). "Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982).

The district court opined that the line extension provision was designed to close a "loophole" whereby manufacturers avoided inflation rebates by introducing slightly altered drugs, and that excluding strength changes would "leave [the loophole] wide open." JA__[Mem. Op. at 10]. Contrary to the district court's misunderstanding, in using the technical term "new formulation" to define "line extensions," Congress actually *did* close the loophole. It prevents manufacturers from using insignificant changes to inactive ingredients to set higher prices. That effort does not mean that Congress wanted to subject drugs of different strengths—with different amounts of active ingredients (which might, as discussed, be developed for a different patient population or even a different condition, *see supra*

16, 40-41)—to the same inflationary penalty as "new formulations" of a drug that merely alter inactive ingredients.

Congress added the line extension provision to address the specific concern that manufacturers could avoid additional, inflation-based rebates by introducing slightly altered, higher-priced versions of existing drugs. *See* H.R. Rep. No. 111-299, pt. 1, at 635 (2009). But as noted above, using the technical term "new formulation" to define line extension makes the statute better correspond to the conduct Congress intended to foreclose. New strengths can significantly change the condition or population the drug treats. *See supra* 16, 40-41; JA__[AR25220–21] (explaining that new strengths include lower dosages for pediatric patients). These are not the narrow circumstances of alleged gamesmanship in drug pricing that Congress sought to address. Thus, the claim that excluding new strengths leaves the loophole "wide open," JA__[Mem. Op. at 10], is dramatically overstated.

The possibility that the established technical meaning may leave some arguably analogous instances outside the line extension provision does not render it incorrect. "[N]o legislation pursues its purpose at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). And, even if accurate, the district court's policy argument cannot override the statutory text. *See Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023) (courts must "appl[y] faithfully the law Congress has written" and not "replace the actual text with speculation as to Congress' intent").

For the foregoing reasons, the 2020 Rule's definition of "new formulation" is contrary to law and the district court's decision should be reversed. "New formulation" does not, and should not, encompass changes in a drug's strength—*i.e.*, the amount of active ingredient.

## II. THE 2020 RULE AND MANUFACTURER RELEASE NO. 119 ARE IMPERMISSIBLY RETROACTIVE AND DENY FAIR NOTICE

The 2020 Rule and its purported retroactive application in Manufacturer Release No. 119 should be set aside because they violate the strict limits on retroactive agency action. "[A]dministrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Nor will a statutory grant of legislative rulemaking authority "be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Id.*

The test for determining whether an agency's retroactive action is permitted mirrors that of statutory retroactivity. *See Quantum*, 714 F.3d at 1342. An agency "may not promulgate a retroactive rule absent express congressional authorization." *Northeast Hosp.*, 657 F.3d at 13 (citing *Bowen*, 488 U.S. at 208). "In the administrative context, a rule is retroactive if it 'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.'"

*Nat'l Mining Ass'n v. Dep't of Lab.*, 292 F.3d 849, 859 (D.C. Cir. 2002). The 2020 Rule fails both parts of this test.

### A. CMS lacks express congressional authorization under the Medicaid statute to engage in retroactive rulemaking

The government has never contended that CMS had authority to issue retroactive regulations under the MDRP. With good reason. The Medicaid statute contains no express congressional authorization allowing CMS to impose retroactive rules, and nowhere in the Medicaid statute does Congress authorize CMS to enact the MDRP or NDRA retroactively. *See* 42 U.S.C. § 1396 *et seq*. Further, the statutes establishing HHS's "general rulemaking power contain no express authorization of retroactive rulemaking." *Bowen*, 488 U.S. at 213. CMS, as a component of HHS, thus lacks express authorization for retroactive rulemaking.

### B. The 2020 Rule retroactively imposes consequences on Chiesi for decisions made about the pricing of Ferriprox before the Rule's issuance

The 2020 Rule imposes new legal consequences as a result of past pricing decisions—thereby creating a retroactive effect—by changing CMS's longstanding approach to the MDRP statute and subjecting Chiesi to liability based on conduct that occurred before the change in regulatory scheme, and indeed, before Chiesi even acquired the Ferriprox therapies. A manufacturer that sells for the same price a drug product competitive to Ferriprox 1000-mg TID, but which had not sold a different strength competing product pre-2020, would be subject to only a fraction of Chiesi's

rebate liability. Only the fact of pre-2020 pricing decisions accounts for this disparate treatment—which is the very definition of retroactive rulemaking.

#### 1. The 2020 Rule increases Chiesi's liability based solely on conduct that occurred before CMS changed the regulation and to which a competitor without that pre-2020 history would not be subject

Just as the statute construed as the district court did would impose retroactive legal consequences on manufacturers who marketed original strength drugs before the 2010 amendment, the 2020 Rule similarly imposes retroactive legal consequences for actions taken *before* CMS's regulatory about-face. When an agency applies a rule to "future" periods, it can still be retroactive if it attaches new legal consequences to completed past conduct. *See Quantum*, 714 F.3d at 1342 (holding that retroactive effect can occur if a law "increase[s] a party's liability for past conduct[] or impose[s] new duties with respect to transactions already completed"). By purporting to require manufacturers to apply the new definition of "new formulation" to *all* drugs, regardless of whether they were marketed before the January 1, 2022 effective date of the 2020 Rule, the 2020 Rule imposes higher rebate liability based on drug pricing decisions made under the old regulatory scheme. Indeed, this is precisely the retroactive effect that Congress legislated around in the 1990 enactment of the MDRP, where it ensured that preexisting drugs would have their inflation-based rebate liability pegged to pricing decisions made only when the statute was enacted. *See supra* 8.

**a.** The 2020 Rule's about-face on the treatment of drug strength changes subjects Chiesi to tens of millions of dollars in additional rebate liability, which it would not have but for CMS's change in position. *See* JA__[SAR1–9]. Much like in *Landgraf*, the 2020 Rule therefore increases the "*extent* of [Chiesi's] liability" for new drug strengths—an "important legal consequence that cannot be ignored." *Landgraf*, 511 U.S. at 284-85 (emphasis in original). This makes the 2020 Rule plainly retroactive.

Furthermore, CMS's changed position has rendered Chiesi subject to the alternative rebate calculation—a new "method for calculating" the amounts Chiesi owes based on pre-2020 pricing decisions, a calculation that would not apply but for the 2020 Rule. *Northeast Hosp.*, 657 F.3d at 17 (finding retroactive agency rule that "alter[ed] the method for calculating" Medicare payments). Regardless of whether Chiesi must recalculate rebates prior to the effective date, the 2020 Rule significantly changes the legal consequences of the setting of pre-2020 initial price setting and Chiesi's acquisition of Ferriprox—"transactions already completed." *Quantum*, 714 F.3d at 1342 (quoting *Landgraf*, 511 U.S. at 280). Had Chiesi or its predecessor known in 2010 that CMS would later take the position that pre-2020 price setting and changes would create tens of millions of dollars in increased liability, it could have made different pricing decisions, but it cannot undo those pricing decisions now.

**b.** The retroactive effect is evident from the fact that the 2020 Rule impacts manufacturers differently based on whether they launched the drugs before or after the 2020 Rule. *See supra* 46-47. The district court concluded that the 2020 Rule is not retroactive because it only changes the rebates manufacturers owe for sales of products with new drug strengths in the *future*, *see* JA__[Mem. Op. at 14-15], but that mistakes the question when the rebate liability is imposed with whether it is retroactive (i.e., whether it is imposed based on pre-enactment conduct). The 2020 Rule transforms already marketed drugs that were not line extensions into line extensions and forces manufacturers to "revisit their prior pricing and price reporting decisions that preceded the effective date of the 2020 Final Rule." JA__[SAR8]. A new drug strength sold in 2021 will have its rebate liability assessed based on the price history of the "original" drug pre-2020. That is precisely the kind of retroactive application that Congress carefully avoided in the 1990 enactment of the MDRP's new inflation-based rebate by using a 1990 base date for preexisting drugs. *See supra* 8. Nor does it matter, as the district court hypothesized during oral argument, that such a manufacturer could eliminate the enhanced rebate liability for the new drug strength by dropping the original drug's price back to its original price (adjusted for inflation only). JA__[Hearing Tr. 4:13-19, 35:16-36:1 (Apr. 15, 2025)]. The manufacturer is still subject to a different rule than another manufacturer just entering the market would be, based solely on its pre-2020 conduct.

The district court's formalistic reliance on the 2020 Rule's statement of "Prospective Implementation" likewise does not change this reality. JA__[Mem. Op. at 14]. A law's language that it applies "prospectively" does not insulate it from challenge as impermissibly retroactive, especially where, as here, it achieves "prospective" results by "impos[ing] new duties with respect to transactions already completed." *Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*, 563 F. Supp. 3d 428, 446 (D. Md. 2021). Nor is the retroactivity problem eliminated simply because CMS delayed the effective date from 2020 to 2022. While that may have given manufacturers time to prepare for the enhanced liability based on pre-2020 pricing decisions, it did not allow them to avoid that retroactive liability.[5]

Contrary to the district court's understanding, the 2020 Rule's retroactive effect is distinguishable from rules that merely "upset[] expectations based in prior law." *Landgraf*, 511 U.S. at 270; *see also* JA__[Mem. Op. at 16]. Listing examples of "uncontroversially prospective statutes," the Supreme Court in *Landgraf* noted that "a new property tax or zoning regulation may upset the reasonable expectations

---

[5] Of course, had CMS forced drug manufacturers to recalculate and pay higher rebates than they had originally paid on sales of "line extension" drugs before the Rule took effect, that would also have been impermissibly retroactive. But, avoiding one type of retroactive application does not ameliorate a different type of retroactivity problem—one that Congress recognized when it originally enacted the MDRP and must be presumed to have wanted to avoid when it enacted the 2010 Amendment.

that prompted those affected to acquire property" and "a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards." 511 U.S. at 269 n.24. The law in each of these situations, unlike the 2020 Rule, does not treat a similarly situated new entrant worse than one who happened to operate under the former legal landscape. A new property tax does not allow a new property owner to pay less tax moving forward than an old property owner for a property with the same value. Nor does a new zoning regulation permit new entrants to use their property in ways that an old property owner cannot. And a gambling ban does not allow the construction of new casinos while preventing old ones from being modernized. Yet under the 2020 Rule, new manufacturers can set the original price of their drugs with the understanding that this original price serves as the inflationary rebate baseline for new drug strengths launched in the future; manufacturers like Chiesi, who already marketed product under the former regulatory scheme, are bound by the consequences of pricing decisions adopted before the new rule was adopted.

In other words, the laws identified in the *Landgraf* examples do not alter the *future legal consequences* of past conduct. A gambling ban, for instance, does not direct that already completed wagers must be refunded in the future, whereas the 2020 Rule reaches back in time to reclassify previously introduced drug strengths as line extensions and subjects them to liability based on previously adopted pricing

decisions. And while the casino builder may suffer *economic* losses, the gambling ban does not attach *new legal consequences* to the previous construction of the casino. The 2020 Rule, however, attaches heightened rebate liability to the original strength price of Ferriprox—a price that is locked in forever.

### 2. The 2020 Rule's about-face from CMS's longstanding interpretation of new formulation retroactively changes the legal landscape

The 2020 Rule is also retroactive because it drastically departed from CMS's longstanding interpretations of "line extension" and "new formulation." This Court has recognized that a regulation is retroactive when it imposes new legal consequences on past conduct by altering the legal landscape under which that conduct occurred. *See Nat'l Mining Ass'n*, 292 F.3d at 859 ("The critical question is whether a challenged rule establishes an interpretation that changes the 'legal landscape.'") (citations omitted). "Even where a rule merely narrows 'a range of possible interpretations' to a single 'precise interpretation,' it may change the legal landscape in a way that is impermissibly retroactive." *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010) (citation omitted). In *Arkema*, the Environmental Protection Agency ("EPA") issued a regulation to "undo what the EPA had, in practice, approved" under a "long-running regulatory regime." *Id.* at 9. This Court held that the EPA's rule was "impermissibly retroactive" because it "contradict[ed] its past

practice, narrow[ed] the range of options and alter[ed] the legal landscape." *Id.* Here, the 2020 Rule did just that.

The 2020 Rule's 180-degree turn from CMS's longstanding interpretation of line extensions and method for calculating rebates—upon which Chiesi was instructed to rely—thereby increased Chiesi's liability without affording Chiesi the ability to avoid increased liability based on its pre-reversal conduct. As discussed above, CMS repeatedly articulated its position that new formulations did not cover changes in the amount of a drug's active ingredient, and thus specifically excluded drug strength changes. *See supra* 37 (discussing 2012 Proposed Rule, 2016 Final Rule, and 2019 IFR). In each Rule, CMS announced its position that new drug strengths were not line extensions while simultaneously telling manufacturers to rely on CMS's pronouncement. Drug manufacturers were entitled to rely on these representations to interpret line extensions as excluding new drug strengths, and to act accordingly.

Only in June 2020 did CMS abruptly change course, even conceding that certain drugs "would likely be classified as line extensions" under the new rule that "would not now be currently classified as line extensions under the statutory definition of line extension." 85 Fed. Reg. at 87096.

Moreover, as in *Arkema*, prior to the 2020 Rule, CMS "had, in practice, approved" manufacturers' understanding of new drug strengths not being line

extensions under CMS's "long-running regulatory regime." 618 F.3d at 9. On a quarterly basis, Chiesi only reported Ferriprox 1000-mg BID as a line extension of Ferriprox 1000-mg TID, because it was effectively a delayed release version of the latter. *See* JA__[SAR2, 5-8]. In its July 2023 letter to CMS, Chiesi specifically reported its "reasonable assumptions" under the Medicaid statute and CMS's prior statements, including that Chiesi did not regard other Ferriprox products as line extensions. *See id*. at 7.

While Chiesi maintains that the plain language of the statute commands the interpretation it advances, at a minimum, the 2020 Rule contradicted CMS's past practice by narrowing "the range of options" for interpreting the statute to the one CMS now advances. *Id.* Under the 2012 Final Rule, 2016 Final Rule, and 2019 IFR, drug manufacturers were free to interpret (and indeed, invited to interpret) "line extension" and "new formulation" as excluding a change in drug strength. The 2020 Rule narrowed CMS's statutory interpretation of the Medicaid statute by defining "new formulation" as including changes in drug strength, which subjected Chiesi to substantially higher rebates based on pricing decisions made under the former regulatory scheme—and that Chiesi can no longer change.

Contrary to the district court's suggestion, JA__[Mem. Op. at 16], this is not an argument that Chiesi is entitled to permanent regulatory stasis. An agency may modify regulations prospectively, including in ways that have future effects on

products previously approved or sold. *See id.* What an agency is not allowed to do, however, is promulgate a rule that drastically departs from the agency's longstanding practice and prior instructions to the public and apply that change to past conduct. *Arkema*, 618 F.3d at 7. Because this is precisely what the 2020 Rule does, it is retroactive.

#### 3. The 2020 Rule's about-face similarly denied Chiesi fair notice

By suddenly interpreting line extensions and "new formulation" to include new drug strengths, the 2020 Rule denied Chiesi fair notice. The Supreme Court recognized that "agencies should provide fair warning of the conduct a regulation prohibits or requires." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (cleaned up). A party only has fair notice "when, 'by reviewing the regulations and other public statements issued by the agency,' it can 'identify, with ascertainable certainty, the standards with which the agency expects parties to conform.'" *Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 216 (D.C. Cir. 2022) (citation omitted). Where the government announces a sudden change from a longstanding interpretation, a party will be effectively deprived of fair notice. *See Fabi Constr. Co. v. Sec'y of Lab.*, 508 F.3d 1077, 1086–89 (D.C. Cir. 2007) (finding agency failed to provide fair notice where it made "no announcement or any other indication of [its] intention" to define a term a specific way such that the regulated

party could not "identify, with ascertainable certainty, the standards with which the agency expects parties to conform" (citation omitted)). The 2020 Rule did just that.

The 2020 Rule upended the settled expectations of Chiesi and all other drug manufacturers who justifiably relied on CMS's consistent express interpretation of the line extension statute. At the time that Chiesi acquired Ferriprox, Chiesi had no indication that CMS would reverse its long-held position. Indeed, for years, Chiesi relied on CMS's position and explicit statements that new drug strengths are not line extensions, going so far as to notify CMS of its application of CMS's statement to its products. *See* JA__[SAR1–9]. Nor did Chiesi (or its predecessor) have the opportunity to consider the rebate liability effect of its initial pricing decisions. Chiesi could not identify with "ascertainable certainty" the standards with which CMS expected it to perform, because *CMS itself* could not even identify these standards. *See Fabi Constr.*, 508 F.3d at 1088. This amounts to the very kind of "unfair surprise" that the Constitution forbids. *Christopher*, 567 U.S. at 156.

## CONCLUSION

Plaintiff respectfully requests that the Court reverse the district court's judgment granting summary judgment for Defendants, and remand with directions to enter judgment in Chiesi's favor setting aside the 2020 Rule and Manufacturer Release No. 119 as contrary to law to the extent they alter the definition of new formulation to include a drug strength change.

Respectfully submitted,

/s/ *Douglas Hallward-Driemeier*

Douglas Hallward-Driemeier
D.C. Bar No. 994052
Stephanie A. Webster
D.C. Bar No. 479524
Chetan A. Patil
D.C. Bar No. 999948
Adam R. Safadi
D.C. Bar No. 241305
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 508-4776
Fax: (202) 383-8354
douglas.hallward-driemeier@ropesgray.com

*Counsel for Appellant*

Dated: August 3, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,905 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type for text and footnotes.

Respectfully submitted,

/s/ *Douglas Hallward-Driemeier*
Douglas Hallward-Driemeier
D.C. Bar No. 994052
Stephanie A. Webster
D.C. Bar No. 479524
Chetan A. Patil
D.C. Bar No. 999948
Adam R. Safadi
D.C. Bar No. 241305
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 508-4776
Fax: (202) 383-8354
douglas.hallward-driemeier@ropesgray.com

*Counsel for Appellant*

Dated: August 3, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of August 2026, I served the foregoing document electronically upon opposing counsel shown below by filing a copy of the document with the Clerk through the Court's electronic docketing system:


Tabitha Bartholomew
U.S. Attorney's Office for the District of Columbia
Civil Division
601 D Street, NW
Washington, DC 20530
Phone: (202) 252-2529
Email: tabitha.bartholomew@usdoj.gov


/s/ *Douglas Hallward-Driemeier*
Douglas Hallward-Driemeier

# ADDENDUM

# TABLE OF CONTENTS

**Statutes**

21 U.S.C. § 355 .......... ADD-1

42 U.S.C. § 1396r-8(b) .......... ADD-2

42 U.S.C. § 1396r-8(c) .......... ADD-12

Comprehensive Addiction and Recovery Act of 2016,
Pub. L. No. 114-198, § 705, 130 Stat. 695 (2016) .......... ADD-26

Health Care and Education Reconciliation Act,
Pub. L. No. 111-152, § 1206, 124 Stat. 1029 (Mar. 30, 2010) .......... ADD-27

Omnibus Budget Reconciliation Act of 1990,
Pub. L. No. 101-508, § 4401, 104 Stat. 1388 (1990) .......... ADD-28

Omnibus Budget Reconciliation Act of 1993,
Pub. L. No. 103–66, § 13602, 107 Stat. 312 (1993) .......... ADD-30

Patient Protection and Affordable Care Act,
Pub. L. No. 111-148, § 2501, 124 Stat. 119 (Mar. 23, 2010) .......... ADD-32

**Regulations**

21 C.F.R. § 314.3 .......... ADD-33

42 C.F.R. § 413.234 .......... ADD-34

42 C.F.R. § 447.502 .......... ADD-37

42 C.F.R. § 447.514 .......... ADD-38

## 21 U.S.C. § 355. New Drugs

### (c) Necessity of effective approval of application

No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug.

## 42 U.S.C. § 1396r-8. Payment for covered outpatient drugs

**(b) Terms of rebate agreement**

(1) **Periodic rebates**

(A) **In general**

A rebate agreement under this subsection shall require the manufacturer to provide, to each State plan approved under this subchapter, a rebate for a rebate period in an amount specified in subsection (c) for covered outpatient drugs of the manufacturer dispensed after December 31, 1990, for which payment was made under the State plan for such period, including such drugs dispensed to individuals enrolled with a medicaid managed care organization if the organization is responsible for coverage of such drugs. Such rebate shall be paid by the manufacturer not later than 30 days after the date of receipt of the information described in paragraph (2) for the period involved.

(B) **Offset against medical assistance**

Amounts received by a State under this section (or under an agreement authorized by the Secretary under subsection (a)(1) or an agreement described in subsection (a)(4)) in any quarter, including amounts received by a State under subsection (c)(4), shall be considered to be a reduction in the amount expended under the State plan in the quarter for medical assistance for purposes of section 1396b(a)(1) of this title.

(C) **Special rule for increased minimum rebate percentage**

(i) **In general**

In addition to the amounts applied as a reduction under subparagraph (B), for rebate periods beginning on or after January 1, 2010, during a fiscal year, the Secretary shall reduce payments to a State under section 1396b(a) of this title in the manner specified in clause (ii), in an amount equal to the product of—

**(I)** 100 percent minus the Federal medical assistance percentage applicable to the rebate period for the State; and

**(II)** the amounts received by the State under such subparagraph that are attributable (as estimated by the Secretary based on utilization and other data) to the increase in the minimum rebate percentage effected by the amendments made by subsections (a)(1), (b), and (d) of section 2501 of the Patient Protection and Affordable Care Act, taking into account the additional drugs included under the amendments made by subsection (c) of section 2501 of such Act.

The Secretary shall adjust such payment reduction for a calendar quarter to the extent the Secretary determines, based upon subsequent utilization and other data, that the reduction for such quarter was greater or less than the amount of payment reduction that should have been made.

(ii) **Manner of payment reduction**

The amount of the payment reduction under clause (i) for a State for a quarter shall be deemed an overpayment to the State under this subchapter to be disallowed against the State's regular quarterly draw for all Medicaid spending under section 1396b(d)(2) of this title. Such a disallowance is not subject to a reconsideration under section 1316(d) of this title.

(2) **State provision of information**

(A) **State responsibility**

Each State agency under this subchapter shall report to each manufacturer not later than 60 days after the end of each rebate period and in a form consistent with a standard reporting format established by the Secretary, information on the total number of units of each dosage form and strength and package size of each covered outpatient drug dispensed after December 31, 1990, for which payment was made under the plan during the period, including such information reported by each medicaid managed care organization, and shall promptly transmit a copy of such report to the Secretary.

(B) **Audits**

A manufacturer may audit the information provided (or required to be provided) under subparagraph (A). Adjustments to rebates shall be made to the extent that information indicates that utilization was greater or less than the amount previously specified.

(3) **Manufacturer provision of price and drug product information**

(A) **In general**

Each manufacturer with an agreement in effect under this section shall report to the Secretary—

(i) not later than 30 days after the last day of each rebate period under the agreement—

**(I)** on the average manufacturer price (as defined in subsection (k)(1)) for covered outpatient drugs for the rebate period under the agreement (including for all such drugs that are sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355(c)]); and

**(II)** for single source drugs and innovator multiple source drugs (including all such drugs that are sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act), on the manufacturer's best price (as defined in subsection (c)(1)(C)) for such drugs for the rebate period under the agreement;

(ii) not later than 30 days after the date of entering into an agreement under this section on the average manufacturer price (as defined in subsection (k)(1)) as of October 1, 1990 for each of the manufacturer's covered outpatient drugs (including for such drugs that are sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act);

(iii) for calendar quarters beginning on or after January 1, 2004, in conjunction with reporting required under clause (i) and by National Drug Code (including package size)—

**(I)** the manufacturer's average sales price (as defined in section 1395w–3a(c) of this title) and the total number of units specified under section 1395w–3a(b)(2)(A) of this title;

**(II)** if required to make payment under section 1395w–3a of this title, the manufacturer's wholesale acquisition cost, as defined in subsection (c)(6) of such section; and

**(III)** information on those sales that were made at a nominal price or otherwise described in section 1395w–3a(c)(2)(B) of this title;

for a drug or biological described in subparagraph (C), (D), (E), or (G) of section 1395u(o)(1) of this title or section 1395rr(b)(14)(B) of this title, and, for calendar quarters beginning on or after January 1, 2007 and only with respect to the information described in subclause (III), for covered outpatient drugs;

(iv) not later than 30 days after the last day of each month of a rebate period under the agreement, on the manufacturer's total number of units that are used to calculate the monthly average manufacturer price for each covered outpatient drug; and

(v) not later than 30 days after the last day of each month of a rebate period under the agreement, such drug product information as the Secretary shall require for each of the manufacturer's covered outpatient drugs.

Information reported under this subparagraph is subject to audit by the Inspector General of the Department of Health and Human Services. Beginning July 1, 2006, the Secretary shall provide on a monthly basis to States under subparagraph (D)(iv) the most recently reported average manufacturer prices for single source drugs and for multiple source drugs and shall, on at least a quarterly basis, update the information posted on the

website under subparagraph (D)(v) (relating to the weighted average of the most recently reported monthly average manufacturer prices). For purposes of applying clause (iii), for calendar quarters beginning on or after January 1, 2022, a drug or biological described in the flush matter following such clause includes items, services, supplies, and products that are payable under part B of subchapter XVIII as a drug or biological.

(B) **Verification surveys of average manufacturer price and manufacturer's average sales price**

The Secretary may survey wholesalers and manufacturers that directly distribute their covered outpatient drugs, when necessary, to verify manufacturer prices and manufacturer's average sales prices (including wholesale acquisition cost) if required to make payment reported under subparagraph (A). The Secretary may impose a civil monetary penalty in an amount not to exceed $100,000 on a wholesaler, manufacturer, or direct seller, if the wholesaler, manufacturer, or direct seller of a covered outpatient drug refuses a request for information about charges or prices by the Secretary in connection with a survey under this subparagraph or knowingly provides false information. The provisions of section 1320a–7a of this title (other than subsections (a) (with respect to amounts of penalties or additional assessments) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply to a penalty or proceeding under section 1320a–7a(a) of this title.

(C) **Penalties**

(i) **Failure to provide timely information**

In the case of a manufacturer with an agreement under this section that fails to provide information required under subparagraph (A) on a timely basis, the amount of the penalty shall be increased by $10,000 for each day in which such information has not been provided and such amount shall be paid to the Treasury, and, if such information is not reported within 90 days of the deadline imposed, the agreement shall be suspended for services furnished after the end of such 90-day period and until the date such information is reported (but in no case shall such suspension be for a period of less than 30 days).

(ii) **False information**

Any manufacturer with an agreement under this section that knowingly provides false information, including information related to drug pricing, drug product information, and data related to drug pricing or drug product information, is subject to a civil money penalty in an amount not to exceed $100,000 for each item of false information. Such civil money penalties are in addition to other penalties as may be prescribed by law. The provisions of section 1320a–7a of this title (other than subsections (a), (b), (f)(3), and (f)(4)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply to a penalty or proceeding under section 1320a–7a(a) of this title.

(iii) **Misclassified drug product or misreported information**

**(I) In general**

Any manufacturer with an agreement under this section that knowingly (as defined in section 1003.110 of title 42, Code of Federal Regulations (or any successor regulation)) misclassifies a covered outpatient drug, such as by knowingly submitting incorrect drug product information, is subject to a civil money penalty for each covered outpatient drug that is misclassified in an amount not to exceed 2 times the amount of the difference between—

**(aa)** the total amount of rebates that the manufacturer paid with respect to the drug to all States for all rebate periods during which the drug was misclassified; and

**(bb)** the total amount of rebates that the manufacturer would have been required to pay, as determined by the Secretary using drug product information provided by the manufacturer, with respect to the drug to all States for all rebate periods during which the drug was misclassified if the drug had been correctly classified.

**(II) Other penalties and recovery of underpaid rebates**

The civil money penalties described in subclause (I) are in addition to other penalties as may be prescribed by law and any other recovery of the underlying underpayment for rebates due under this section or the terms of the rebate agreement as determined by the Secretary.

(iv) **Increasing oversight and enforcement**

Each year the Secretary shall retain, in addition to any amount retained by the Secretary to recoup investigation and litigation costs related to the enforcement of the civil money penalties under this subparagraph and subsection (c)(4)(B)(ii)(III), an amount equal to 25 percent of the total amount of civil money penalties collected under this subparagraph and subsection (c)(4)(B)(ii)(III) for the year, and such retained amount shall be available to the Secretary, without further appropriation and until expended, for activities related to the oversight and enforcement of this section and agreements under this section, including—

**(I)** improving drug data reporting systems;

**(II)** evaluating and ensuring manufacturer compliance with rebate obligations; and

**(III)** oversight and enforcement related to ensuring that manufacturers accurately and fully report drug information, including data related to drug classification.

(D) **Confidentiality of information**

Notwithstanding any other provision of law, information disclosed by manufacturers or wholesalers under this paragraph or under an agreement with the Secretary of Veterans Affairs described in subsection (a)(6)(A) (other than the wholesale acquisition cost for purposes of carrying out section 1395w–3a of this title) is confidential and shall not be disclosed by the Secretary or the Secretary of Veterans Affairs or a State agency (or contractor therewith) in a

form which discloses the identity of a specific manufacturer or wholesaler, prices charged for drugs by such manufacturer or wholesaler, except—

(i) as the Secretary determines to be necessary to carry out this section, to carry out section 1395w–3a of this title (including the determination and implementation of the payment amount and the rebate), or to carry out section 1395w–3b of this title, section 1320f–1(f) of this title, including rebates under paragraph (4) of such section, or section 1395w–114b of this title,

(ii) to permit the Comptroller General to review the information provided,

(iii) to permit the Director of the Congressional Budget Office to review the information provided,

(iv) to States to carry out this subchapter,

(v) to the Secretary to disclose (through a website accessible to the public) the weighted average of the most recently reported monthly average manufacturer prices and the average retail survey price determined for each multiple source drug in accordance with subsection (f),

(vi) in the case of categories of drug product or classification information that were not considered confidential by the Secretary on the day before April 18, 2019, and

(vii) to permit the Executive Director of the Medicare Payment Advisory Commission and the Executive Director of the Medicaid and CHIP Payment and Access Commission to review the information provided.

The previous sentence shall also apply to information disclosed under section 1395w–102(d)(2) or 1395w–104(c)(2)(G) of this title and drug pricing data reported under the first sentence of section 1395w–141(i)(1) of this title. Any information disclosed to the Executive Director of the Medicare Payment Advisory Commission or the Executive Director of the Medicaid and CHIP Payment and Access Commission pursuant to this subparagraph shall not be disclosed by either such Executive Director in a form which discloses the

identity of a specific manufacturer or wholesaler or prices charged for drugs by such manufacturer or wholesaler. Such information also shall not be disclosed by either such Executive Director to individual Commissioners of the Medicare Payment Advisory Commission or of the Medicaid and CHIP Payment and Access Commission in a form which discloses the identity of a specific manufacturer or wholesaler or prices charged for drugs by such manufacturer or wholesaler.

(4) **Length of agreement**

(A) **In general**

A rebate agreement shall be effective for an initial period of not less than 1 year and shall be automatically renewed for a period of not less than one year unless terminated under subparagraph (B).

(B) **Termination**

(i) **By the Secretary**

The Secretary may provide for termination of a rebate agreement for violation of the requirements of the agreement or other good cause shown. Such termination shall not be effective earlier than 60 days after the date of notice of such termination. The Secretary shall provide, upon request, a manufacturer with a hearing concerning such a termination, but such hearing shall not delay the effective date of the termination.

(ii) **By a manufacturer**

A manufacturer may terminate a rebate agreement under this section for any reason. Any such termination shall not be effective until the calendar quarter beginning at least 60 days after the date the manufacturer provides notice to the Secretary.

(iii) **Effectiveness of termination**

Any termination under this subparagraph shall not affect rebates due under the agreement before the effective date of its termination.

(iv) **Notice to States**

In the case of a termination under this subparagraph, the Secretary shall provide notice of such termination to the States within not less than 30 days before the effective date of such termination.

(v) **Application to terminations of other agreements**

The provisions of this subparagraph shall apply to the terminations of agreements described in section 256b(a)(1) of this title and master agreements described in section 8126(a) of title 38.

(C) **Delay before reentry**

In the case of any rebate agreement with a manufacturer under this section which is terminated, another such agreement with the manufacturer (or a successor manufacturer) may not be entered into until a period of 1 calendar quarter has elapsed since the date of the termination, unless the Secretary finds good cause for an earlier reinstatement of such an agreement.

**42 U.S.C. § 1396r-8. Payment for covered outpatient drugs**

**(c) Determination of amount of rebate**

(1) **Basic rebate for single source drugs and innovator multiple source drugs**

(A) **In general**

Except as provided in paragraph (2), the amount of the rebate specified in this subsection for a rebate period (as defined in subsection (k)(8)) with respect to each dosage form and strength of a single source drug or an innovator multiple source drug shall be equal to the product of—

(i) the total number of units of each dosage form and strength paid for under the State plan in the rebate period (as reported by the State); and

(ii) subject to subparagraph (B)(ii), the greater of—

**(I)** the difference between the average manufacturer price and the best price (as defined in subparagraph (C)) for the dosage form and strength of the drug, or

**(II)** the minimum rebate percentage (specified in subparagraph (B)(i)) of such average manufacturer price,

for the rebate period.

(B) **Range of rebates required**

(i) **Minimum rebate percentage**

For purposes of subparagraph (A)(ii)(II), the "minimum rebate percentage" for rebate periods beginning—

**(I)** after December 31, 1990, and before October 1, 1992, is 12.5 percent;

**(II)** after September 30, 1992, and before January 1, 1994, is 15.7 percent;

**(III)** after December 31, 1993, and before January 1, 1995, is 15.4 percent;

**(IV)** after December 31, 1994, and before January 1, 1996, is 15.2 percent;

**(V)** after December 31, 1995, and before January 1, 2010 [1] is 15.1 percent; and

**(VI)** except as provided in clause (iii), after December 31, 2009,[2] 23.1 percent.

(ii) **Temporary limitation on maximum rebate amount**

In no case shall the amount applied under subparagraph (A)(ii) for a rebate period beginning—

**(I)** before January 1, 1992, exceed 25 percent of the average manufacturer price; or

**(II)** after December 31, 1991, and before January 1, 1993, exceed 50 percent of the average manufacturer price.

(iii) **Minimum rebate percentage for certain drugs**

**(I) In general**

In the case of a single source drug or an innovator multiple source drug described in subclause (II), the minimum rebate percentage for rebate periods specified in clause (i)(VI) is 17.1 percent.

**(II) Drug described**

For purposes of subclause (I), a single source drug or an innovator multiple source drug described in this subclause is any of the following drugs:

**(aa)** A clotting factor for which a separate furnishing payment is made under section 1395u(o)(5) of this title and which is included on a list of such factors specified and updated regularly by the Secretary.

**(bb)** A drug approved by the Food and Drug Administration exclusively for pediatric indications.

(C) **"Best price" defined**

For purposes of this section—

(i) **In general**

The term "best price" means, with respect to a single source drug or innovator multiple source drug of a manufacturer (including the lowest price available to any entity for any such drug of a manufacturer that is sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355(c)]), the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States, excluding—

**(I)** any prices charged on or after October 1, 1992, to the Indian Health Service, the Department of Veterans Affairs, a State home receiving funds under section 1741 of title 38, the Department of Defense, the Public Health Service, or a covered entity described in subsection (a)(5)(B) (including inpatient prices charged to hospitals described in section 256b(a)(4)(L) of this title);

**(II)** any prices charged under the Federal Supply Schedule of the General Services Administration;

**(III)** any prices used under a State pharmaceutical assistance program;

**(IV)** any depot prices and single award contract prices, as defined by the Secretary, of any agency of the Federal Government;

**(V)** the prices negotiated from drug manufacturers for covered discount card drugs under an endorsed discount card program under section 1395w–141 of this title; and

**(VI)** subject to clause (ii)(V), any prices charged which are negotiated by a prescription drug plan under part D of subchapter XVIII, by an MA–PD plan under part C of such subchapter with respect to covered part D drugs or by a qualified retiree prescription drug plan (as defined in section 1395w–132(a)(2) of this title) with respect to such drugs on behalf of individuals entitled to benefits under part A or enrolled under part B of such subchapter, or any discounts provided by manufacturers under the Medicare coverage gap discount program under section 1395w–114a of this title or under the manufacturer discount program under section 1395w–114c of this title.

(ii) **Special rules**

The term "best price"—

**(I)** shall be inclusive of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates (other than rebates under this section, section 1395w–3a(i) of this title, or section 1395w–114b of this title);

**(II)** shall be determined without regard to special packaging, labeling, or identifiers on the dosage form or product or package;

**(III)** shall not take into account prices that are merely nominal in amount

**(IV)** in the case of a manufacturer that approves, allows, or otherwise permits any other drug of the manufacturer to be sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355(c)], shall be inclusive of the lowest price for such authorized drug available from the manufacturer during the rebate period to any manufacturer, wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States, excluding those prices described in subclauses (I) through (IV) of clause (i); and

**(V)** in the case of a rebate period and a covered outpatient drug that is a selected drug (as referred to in section 1320f–1(c) of this title) during such rebate period, shall be inclusive of the maximum fair price (as defined in section 1320f(c)(3) of this title) for such drug with respect to such period.

(iii) **Application of auditing and recordkeeping requirements**

With respect to a covered entity described in section 256b(a)(4)(L) of this title, any drug purchased for inpatient use shall be subject to the auditing and recordkeeping requirements described in section 256b(a)(5)(C) of this title.

(D) **Limitation on sales at a nominal price**

(i) **In general**

For purposes of subparagraph (C)(ii)(III) and subsection (b)(3)(A)(iii)(III), only sales by a manufacturer of covered outpatient drugs at nominal prices to the following shall be considered to be sales at a nominal price or merely nominal in amount:

**(I)** A covered entity described in section 256b(a)(4) of this title.

**(II)** An intermediate care facility for the mentally retarded.

**(III)** A State-owned or operated nursing facility.

**(IV)** An entity that—

**(aa)** is described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Act or is State-owned or operated; and

**(bb)** would be a covered entity described in section 256b(a)(4) [4] of this title insofar as the entity provides the same type of services to the same type of populations as a covered entity described in such section provides, but does not receive funding under a provision of law referred to in such section;

**(V)** A public or nonprofit entity, or an entity based at an institution of higher learning whose primary purpose is to provide health care services to students of that institution, that provides a service or services described under section 300(a) of this title.

**(VI)** Any other facility or entity that the Secretary determines is a safety net provider to which sales of such drugs at a nominal price would be appropriate based on the factors described in clause (ii).

(ii) **Factors**

The factors described in this clause with respect to a facility or entity are the following:

**(I)** The type of facility or entity.

**(II)** The services provided by the facility or entity.

**(III)** The patient population served by the facility or entity.

**(IV)** The number of other facilities or entities eligible to purchase at nominal prices in the same service area.

(iii) **Nonapplication**

Clause (i) shall not apply with respect to sales by a manufacturer at a nominal price of covered outpatient drugs pursuant to a master agreement under section 8126 of title 38.

(iv) **Rule of construction**

Nothing in this subparagraph shall be construed to alter any existing statutory or regulatory prohibition on services with respect to an entity described in clause (i)(IV), including the prohibition set forth in section 300a–6 of this title.

(2) **Additional rebate for single source and innovator multiple source drugs**

(A) **In general**

The amount of the rebate specified in this subsection for a rebate period, with respect to each dosage form and strength of a single source drug or an innovator multiple source drug, shall be increased by an amount equal to the product of—

(i) the total number of units of such dosage form and strength dispensed after December 31, 1990, for which payment was made under the State plan for the rebate period; and

(ii) the amount (if any) by which—

**(I)** the average manufacturer price for the dosage form and strength of the drug for the period, exceeds

**(II)** the average manufacturer price for such dosage form and strength for the calendar quarter beginning July 1, 1990 (without regard to whether or not the drug has been sold or transferred to an entity, including a division or subsidiary of the manufacturer, after the first day of such quarter), increased by the percentage by which the consumer price index for all urban consumers

(United States city average) for the month before the month in which the rebate period begins exceeds such index for September 1990.

(B) **Treatment of subsequently approved drugs**

In the case of a covered outpatient drug approved by the Food and Drug Administration after October 1, 1990, clause (ii)(II) of subparagraph (A) shall be applied by substituting "the first full calendar quarter after the day on which the drug was first marketed" for "the calendar quarter beginning July 1, 1990" and "the month prior to the first month of the first full calendar quarter after the day on which the drug was first marketed" for "September 1990".

(C) **Treatment of new formulations**

(i) **In general**

In the case of a drug that is a line extension of a single source drug or an innovator multiple source drug that is an oral solid dosage form, the rebate obligation for a rebate period with respect to such drug under this subsection shall be the greater of the amount described in clause (ii) for such drug or the amount described in clause (iii) for such drug.

(ii) **Amount 1**

For purposes of clause (i), the amount described in this clause with respect to a drug described in clause (i) and rebate period is the amount computed under paragraph (1) for such drug, increased by the amount computed under subparagraph (A) and, as applicable, subparagraph (B) for such drug and rebate period.

(iii) **Amount 2**

For purposes of clause (i), the amount described in this clause with respect to a drug described in clause (i) and rebate period is the amount computed under paragraph (1) for such drug, increased by the product of—

**(I)** the average manufacturer price for the rebate period of the line extension of a single source drug or an innovator multiple source drug that is an oral solid dosage form;

**(II)** the highest additional rebate (calculated as a percentage of average manufacturer price) under this paragraph for the rebate period for any strength of the original single source drug or innovator multiple source drug; and

**(III)** the total number of units of each dosage form and strength of the line extension product paid for under the State plan in the rebate period (as reported by the State).

In this subparagraph, the term "line extension" means, with respect to a drug, a new formulation of the drug, such as an extended release formulation, but does not include an abuse-deterrent formulation of the drug (as determined by the Secretary), regardless of whether such abuse-deterrent formulation is an extended release formulation.

(D) **Maximum rebate amount**

In no case shall the sum of the amounts applied under paragraph (1)(A)(ii) and this paragraph with respect to each dosage form and strength of a single source drug or an innovator multiple source drug for a rebate period beginning after December 31, 2009, and before January 1, 2024, exceed 100 percent of the average manufacturer price of the drug.

(3) **Rebate for other drugs**

(A) **In general**

Except as provided in subparagraph (C), the amount of the rebate paid to a State for a rebate period with respect to each dosage form and strength of covered outpatient drugs (other than single source drugs and innovator multiple source drugs) shall be equal to the product of—

(i) the applicable percentage (as described in subparagraph (B)) of the average manufacturer price for the dosage form and strength for the rebate period, and

(ii) the total number of units of such dosage form and strength dispensed after December 31, 1990, for which payment was made under the State plan for the rebate period.

(B) **"Applicable percentage" defined**

For purposes of subparagraph (A)(i), the "applicable percentage" for rebate periods beginning—

(i) before January 1, 1994, is 10 percent,

(ii) after December 31, 1993, and before January 1, 2010, is 11 percent; and

(iii) after December 31, 2009, is 13 percent.

(C) **Additional rebate**

(i) **In general**

The amount of the rebate specified in this paragraph for a rebate period, with respect to each dosage form and strength of a covered outpatient drug other than a single source drug or an innovator multiple source drug of a manufacturer, shall be increased in the manner that the rebate for a dosage form and strength of a single source drug or an innovator multiple source drug is increased under subparagraphs (A) and (D) of paragraph (2), except as provided in clause (ii).

(ii) **Special rules for application of provision**

In applying subparagraphs (A) and (D) of paragraph (2) under clause (i)—

**(I)** the reference in subparagraph (A)(i) of such paragraph to “1990” shall be deemed a reference to “2014”;

**(II)** subject to clause (iii), the reference in subparagraph (A)(ii) of such paragraph to “the calendar quarter beginning July 1, 1990” shall be deemed a reference to “the calendar quarter beginning July 1, 2014”; and

**(III)** subject to clause (iii), the reference in subparagraph (A)(ii) of such paragraph to “September 1990” shall be deemed a reference to “September 2014”;

**(IV)** the references in subparagraph (D) of such paragraph to “paragraph (1)(A)(ii)”, “this paragraph”, and “December 31, 2009” shall be deemed references to “subparagraph (A)”, “this subparagraph”, and “December 31, 2014”, respectively; and

**(V)** any reference in such paragraph to a “single source drug or an innovator multiple source drug” shall be deemed to be a reference to a drug to which clause (i) applies.

(iii) **Special rule for certain noninnovator multiple source drugs**

In applying paragraph (2)(A)(ii)(II) under clause (i) with respect to a covered outpatient drug that is first marketed as a drug other than a single source drug or an innovator multiple source drug after April 1, 2013, such paragraph shall be applied—

**(I)** by substituting “the applicable quarter” for “the calendar quarter beginning July 1, 1990”; and

**(II)** by substituting “the last month in such applicable quarter” for “September 1990”.

(iv) **Applicable quarter defined**

In this subsection, the term "applicable quarter" means, with respect to a drug described in clause (iii), the fifth full calendar quarter after which the drug is marketed as a drug other than a single source drug or an innovator multiple source drug.

(4) **Recovery of unpaid rebate amounts due to misclassification of covered outpatient drugs**

(A) **In general**

If the Secretary determines that a manufacturer with an agreement under this section paid a lower per-unit rebate amount to a State for a rebate period as a result of the misclassification by the manufacturer of a covered outpatient drug (without regard to whether the manufacturer knowingly made the misclassification or should have known that the misclassification would be made) than the per-unit rebate amount that the manufacturer would have paid to the State if the drug had been correctly classified, the manufacturer shall pay to the State an amount equal to the product of—

(i) the difference between—

**(I)** the per-unit rebate amount paid to the State for the period; and

**(II)** the per-unit rebate amount that the manufacturer would have paid to the State for the period, as determined by the Secretary, if the drug had been correctly classified; and

(ii) the total units of the drug paid for under the State plan in the period.

(B) **Authority to correct misclassifications**

(i) **In general**

If the Secretary determines that a manufacturer with an agreement under this section has misclassified a covered outpatient drug (without regard to whether the manufacturer knowingly made the misclassification or should have known that the misclassification would be made), the Secretary shall notify the manufacturer of the misclassification and require the manufacturer to correct the misclassification in a timely manner.

(ii) **Enforcement**

If, after receiving notice of a misclassification from the Secretary under clause (i), a manufacturer fails to correct the misclassification by such time as the Secretary shall require, until the manufacturer makes such correction, the Secretary may do any or all of the following:

**(I)** Correct the misclassification, using drug product information provided by the manufacturer, on behalf of the manufacturer.

**(II)** Suspend the misclassified drug and the drug's status as a covered outpatient drug under the manufacturer's national rebate agreement, and exclude the misclassified drug from Federal financial participation in accordance with section 1396b(i)(10)(E) of this title.

**(III)** Impose a civil money penalty (which shall be in addition to any other recovery or penalty which may be available under this section or any other provision of law) for each rebate period during which the drug is misclassified not to exceed an amount equal to the product of—

**(aa)** the total number of units of each dosage form and strength of such misclassified drug paid for under any State plan during such a rebate period; and

**(bb)** 23.1 percent of the average manufacturer price for the dosage form and strength of such misclassified drug.

(C) **Reporting and transparency**

(i) **In general**

The Secretary shall submit a report to Congress on at least an annual basis that includes information on the covered outpatient drugs that have been identified as misclassified, any steps taken to reclassify such drugs, the actions the Secretary has taken to ensure the payment of any rebate amounts which were unpaid as a result of such misclassification, and a disclosure of expenditures from the fund created in subsection (b)(3)(C)(iv), including an accounting of how such funds have been allocated and spent in accordance with such subsection.

(ii) **Public access**

The Secretary shall make the information contained in the report required under clause (i) available to the public on a timely basis.

(D) **Other penalties and actions**

Actions taken and penalties imposed under this clause shall be in addition to other remedies available to the Secretary including terminating the manufacturer's rebate agreement for noncompliance with the terms of such agreement and shall not exempt a manufacturer from, or preclude the Secretary from pursuing, any civil money penalty under this subchapter or subchapter XI, or any other penalty or action as may be prescribed by law.

**Comprehensive Addiction and Recovery Act of 2016, Pub. L. No. 114-198, § 705, 130 Stat. 695 (2016). Excluding Abuse-Deterrent Formulations of Prescription Drugs from the Medicaid Additional Rebate Requirement for New Formulations of Prescription Drugs**

**(a)** **In general.** —The last sentence of section 1927(c)(2)(C) of the Social Security Act (42 U.S.C. 1396r–8(c)(2)(C)) is amended by inserting before the period at the end the following: '', but does not include an abuse-deterrent formulation of the drug (as determined by the Secretary), regardless of whether such abuse- deterrent formulation is an extended release formulation''.

**Health Care and Education Reconciliation Act, Pub. L. No. 111-152, § 1206, 124 Stat. 1029 (Mar. 30, 2010). Drug Rebates for New Formulations of Existing Drugs**

**(a) Treatment of New Formulations.** —Subparagraph (C) of section 1927(c)(2) of the Social Security Act (42 U.S.C. 1396r-8(c)(2)), as added by section 2501(d) of the Patient Protection and Affordable Care Act, is amended to read as follows:

(C) **Treatment of new formulations**

—In the case of a drug that is a line extension of a single source drug or an innovator multiple source drug that is an oral solid dosage form, the rebate obligation with respect to such drug under this section shall be the amount computed under this section for such new drug or, if greater, the product of—

"‘‘(i) the average manufacturer price of the line extension of a single source drug or an innovator multiple source drug that is an oral solid dosage form;

‘‘(ii) the highest additional rebate (calculated as a percentage of average manufacturer price) under this section for any strength of the original single source drug or innovator multiple source drug; and

‘‘(iii) the total number of units of each dosage form and strength of the line extension product paid for under the State plan in the rebate period (as reported by the State).

In this subparagraph, the term ‘line extension’ means, with respect to a drug, a new formulation of the drug, such as an extended release formulation.”.

**Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4401, 104 Stat. 1388 (1990). Reimbursement for Prescribed Drugs**

**(a) In General .—**

*****

(3) **Rebate agreements for covered outpatient drugs, drug use review, and related provisions.**—Title XIX of the Social Security Act is amended by redesignating section 1927 as section 1928 and by inserting after section 1926 the following new section:

**"Payment for Covered Outpatient Drugs**

**Sec. 1927.**

*****

**(c) Amount of Rebate**

(1) **Basic rebate for single source drugs and innovator multiple source drugs**

*****

(D) In the case of a covered outpatient drug approved for marketing after October 1, 1990, any reference in this paragraph to 'October 1, 1990' shall be a reference to the first day of the first month during which the drug was marketed.

(1) **Additional rebate for single source and innovator multiple source drugs**

(A) Each manufacturer shall remit an additional rebate to the State medical assistance plan in an amount equal to:

(i) For calendar quarters (or other periods) beginning after December 31, 1990 and ending before January 1, 1994—

**(I)** The total number of each dosage form and strength of a single source or innovator multiple source drug dispensed during the calendar quarter (or other period); multiplied by

**(II)** (aa) the average manufacturer price for each dosage form and strength, minus

(bb) the average manufacturer price for each such dosage form and strength in effect on October 1, 1990, increased by the percentage increase in the Consumer Price Index for all urban consumers (U.S. average) from October 1, 1990, to the month before the beginning of the calendar quarter (or other period) involved

(ii) For calendar quarters (or other periods) beginning after December 31, 1993—

**(I)** The total number of each dosage form and strength of a single source or innovative multiple source drug dispensed during the calendar quarter (or other period); multiplied by

**(II)** The amount, if any, by which the weighted average manufacturer price for single source and innovator multiple source drugs of a manufacturer exceeds the weighted average manufacturer price for the manufacturer as of October 1, 1990, increased by the percentage increase in the Consumer Price Index for all urban consumers (U.S. average) from October 1, 1990, to the month before the beginning of the calendar quarter (or other period) involved.

**Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103–66, § 13602, 107 Stat. 312 (1993). Additional Federal Savings through Modifications to Drug Rebate Program**

**(c) Changes in Rebate Program**

(1) **In general**

Section 1927 (42 U.S.C. 1396r-8) is amended by striking subsection (c) and all that follows through "(2)" in subsection (f)(2) and inserting the following:

(2) **Additional rebate for single source and innovator multiple source drugs**

(A) **In general**

The amount of the rebate specified in this subsection for a rebate period, with respect to each dosage form and strength of a single source drug or an innovator multiple source drug, shall be increased by an amount equal to the product of—

(i) the total number of units of such dosage form and strength dispensed after December 31, 1990, for which payment was made under the State plan for the rebate period; and

(ii) the amount (if any) by which—

**(I)** the average manufacturer price for the dosage form and strength of the drug for the period, exceeds

**(II)** the average manufacturer price for such dosage form and strength for the calendar quarter beginning July 1, 1990 (without regard to whether or not the drug has been sold or transferred to an entity, including a division or subsidiary of the manufacturer, after the first day of such quarter), increased by the percentage by which the consumer price index for all urban consumers (United States city average) for the month before the month in which the rebate period begins exceeds such index for September 1990.

(B) **Treatment of subsequently approved drugs**

In the case of a covered outpatient drug approved by the Food and Drug Administration after October 1, 1990, clause (ii)(II) of subparagraph (A) shall be applied by substituting 'the first full calendar quarter after the day on which the drug was first marketed' for 'the calendar quarter beginning July 1, 1990' and 'the month prior to the first month of the first full calendar quarter after the day on which the drug was first marketed' for 'September 1990'.

**Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 2501, 124 Stat. 119 (Mar. 23, 2010). Prescription Drug Rebates**

**(d) Additional Rebate for New Formulations of Existing Drugs**

(1) **In general**

Section 1927(c)(2) of the Social Security Act (42 U.S.C. 1396r–8(c)(2)) is amended by adding at the end the following new subparagraph:

**''(C) Treatment of new formulations.—**

**''(i) In general.**—Except as provided in clause (ii), in the case of a drug that is a new formulation, such as an extended-release formulation, of a single source drug or an innovator multiple source drug, the rebate obligation with respect to the drug under this section shall be the amount computed under this section for the new formulation of the drug or, if greater, the product of—

''(I) the average manufacturer price for each dosage form and strength of the new formulation of the single source drug or innovator multiple source drug;

''(II) the highest additional rebate (calculated as a percentage of average manufacturer price) under this section for any strength of the original single source drug or innovator multiple source drug; and

''(III) the total number of units of each dosage form and strength of the new formulation paid for under the State plan in the rebate period (as reported by the State)."

## 21 C.F.R. § 314.3. Definitions

*Strength* is the amount of drug substance contained in, delivered, or deliverable from a drug product, which includes:

(1)

(i) The total quantity of drug substance in mass or units of activity in a dosage unit or container closure (e.g., weight/unit dose, weight/volume or weight/weight in a container closure, or units/volume or units/weight in a container closure); and/or, as applicable.

(ii) The concentration of the drug substance in mass or units of activity per unit volume or mass (e.g., weight/weight, weight/volume, or units/volume); or

(2) Such other criteria the Agency establishes for determining the amount of drug substance contained in, delivered, or deliverable from a drug product if the weights and measures described in paragraph (i) of this definition do not apply (e.g., certain drug-device combination products for which the amount of drug substance is emitted per use or unit time).

## 42 C.F.R. § 413.234. Drug designation process

**(e) Exclusion criteria for the transitional drug add-on payment adjustment.** A new renal dialysis drug used to treat or manage a condition for which there is an ESRD PPS functional category is not eligible for payment using the transitional drug add-on payment adjustment described in paragraph (c)(1) of this section if the drug is approved by FDA under section 505(j) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) or the new drug application (NDA) for the drug is classified by FDA as Type 3, 5, 7, or 8, Type 3 in combination with Type 2 or Type 4, or Type 5 in combination with Type 2, or Type 9 when the parent NDA is a Type 3, 5, 7 or 8 as described in paragraphs (e)(1) through (7) of this section, respectively:

(2) Type 5 NDA – New Formulation or Other Differences

(i) A Type 5 NDA is for a product, other than a new dosage form, that differs from a product already approved or marketed in the U.S. because of one of the following:

(A) The product involves changes in inactive ingredients that require either bioequivalence studies or clinical studies for approval and is submitted as an original NDA rather than as a supplement by the applicant of the approved product;

(B) The product is a duplicate of a drug product by another applicant (same active ingredient, same dosage form, same or different indication, or same combination), and

(1) Requires bioequivalence testing (including bioequivalence studies with clinical endpoints), but is not eligible for submission as a section 505(j) of the FD&C Act application; or

(2) Requires safety or effectiveness testing because of novel inactive ingredients; or

(3) Requires full safety or effectiveness testing because it is:

(i) Subject to exclusivity held by another applicant, or

(ii) A product of biotechnology and its safety and/or effectiveness are not assessable through bioequivalence testing, or

(iii) A crude natural product, or

(iv) Ineligible for submission under section 505(j) of the FD&C Act because it differs in bioavailability (for example, products with different release patterns); or

(4) The applicant has a right of reference to the application.

(C) The product contains an active ingredient or active moiety that has been previously approved or marketed in the U.S. only as part of a combination. This applies to active ingredients previously approved or marketed as part of a physical or chemical combination, or as part of a mixture derived from recombinant deoxyribonucleic acid technology or natural sources.

(D) The product is a combination product that differs from a previously marketed combination by the removal of one or more active ingredients or by substitution of a new ester or salt or other noncovalent derivative of an active ingredient for one or more of the active ingredients. In the latter case, the NDA would be classified as a combination of a Type 2 NDA as described in paragraph (e)(5)(i) of this section, with a Type 5 NDA as described in paragraph (e)(2) of this section.

(E) The product contains a different strength of one or more active ingredients in a previously approved or marketed combination. A Type 5 NDA, as described in paragraph (e)(2) of this section, would generally be submitted by an applicant other than the holder of the approved application for the approved product. A similar change in an approved product by the applicant of the approved product would usually be submitted as a supplemental application.

(F) The product differs in bioavailability (for example, superbioavailable or different controlled-release pattern) and, therefore, is ineligible for submission as

an abbreviated new drug application (ANDA) under section 505(j) of the FD&C Act.

(G) The product involves a new plastic container that requires safety studies beyond limited confirmatory testing (see 21 CFR 310.509, Parenteral drug products in plastic containers).

(ii) [Reserved]

## 42 C.F.R. § 447.502. Definitions

*National drug code (NDC)* means the numerical code maintained by the FDA that includes the labeler code, product code, and package code. For purposes of this subpart, the NDC is considered to be an 11-digit code, unless otherwise specified in this subpart as being without regard to package size (that is, the 9-digit numerical code).

**42 C.F.R. § 447.514. Upper limits for multiple source drugs**

**(c) Establishment and issuance of a listing**

(1) CMS will establish and issue listings that identify and set upper limits for multiple source drugs available for purchase by retail community pharmacies on a nationwide basis that FDA has rated at least three drug products as pharmaceutically and therapeutically equivalent in the "Approved Drug Products with Therapeutic Equivalence Evaluations" which is available at http://www.accessdata.fda.gov/scripts/cder/ob/. Only pharmaceutically and therapeutically equivalent formulations will be used to determine such limit, and such limit will only be applied to those equivalent drug products.

(2) CMS publishes the list of multiple source drugs for which upper limits have been established and any revisions to the list in Medicaid Program issuances.